JOSIAH D. PAYNE, as Trustee, etc., Respondent, *v.* ELIZABETH H. FREER et al., Appellants.

By an agreement between co-partners engaged in the business of banking, each of whom contributed to the capital of the firm, it was stipulated that each partner should be allowed six and one-half per cent per annum on the average amount of his deposits, and if either should overdraw his account, he should pay interest on the average of such overdrafts at the rate of ten per cent per annum during the continuance of the partnership. F., one of the partners, overdrew his account, and gave to plaintiff, as trustee for the firm, his bond and mortgage for the balance against him, as shown by the partnership books, interest being charged against him as stipulated. The co-partnership was dissolved by the death of F. In an action to foreclose the mortgage, wherein the defense was usury, the trial court found that the agreement was not a device to evade the usury law. *Held*, that the overdrafts were not usurious loans, that the agreement was in effect simply that the partner withdrawing funds should make a contribution to profits equal to the estimated earning power of the capital withdrawn, and so was valid.

When the partnership was formed there were certain notes outstanding indorsed by F. and which, as between him and the makers, were for him to pay; these were taken up by the firm, and were renewed from time to time, the interest being charged to the account of F. at the stipulated rate, and the advances to take up the notes were finally also charged. *Held*, that these advances were overdrafts within the meaning of the partnership agreement and were not usurious.

(Argued November 22, 1882 ; decided January 16, 1883.)

APPEAL from an order of the General Term of the Supreme Court, in the third judicial department, entered upon an order

made September 6, 1881, which reversed a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term. (Reported below, 25 Hun, 124).

This action was brought by plaintiff, as "trustee for Schuyler County Bank," to foreclose a mortgage executed by George G. Freer and wife. The material facts are stated in the opinion.

*George B. Bradley* for appellants. The finding that the Hill notes were indorsed by Freer and discounted at ten per cent per annum by the bank, were so discounted under a usurious agreement, was justified by the evidence and they infected the mortgage with usury and rendered it void. (*Haughtwout* v. *Garrison,* 69 N. Y. 339; *Fiedler* v. *Darrin,* 50 id. 437; *Thurston* v. *Cornell,* 38 id. 281; *Cope* v. *Wheeler,* 41 id. 309; *Price* v. *Lyons Bk.,* 33 id. 55; *Winsted Bk.* v. *Webb,* 39 id. 325; *Swartwood* v. *Payne,* 19 Johns. 294; *Williams* v. *Storm,* 2 Duer, 52; *Jones* v. *Hake,* 2 Johns. Cas. 60; *Wilkie* v *Roosevelt,* 3 id. 66; *Pratt* v. *Elkins,* 80 N. Y. 198–202; *Wyeth* v. *Braniff,* 84 id. 627; *Jackson* v. *Packard,* 6 Wend. 415; *Fulton Bk.* v. *Benedict,* 1 Hall, 480; *Williams* v. *Fitzburgh,* 37 N. Y. 446; *Rice* v. *Welling,* 5 Wend. 397; *Hammond* v. *Hopping,* 13 id. 511; *Newell* v. *Doty,* 33 N. Y. 83; *Gerwig* v. *Sitterly,* 56 id. 214; *Patterson* v. *Birdsall,* 64 id. 294.) The finding by the court on the question of the purpose and intent of the bank in taking the rate of ten per cent per annum in discounting the Hill notes is conclusive. (*Bergin* v. *Wemple,* 30 N. Y. 319, 324; *Baldwin* v. *Van Dusen,* 37 id. 487, 490; *Borst* v. *Spelman,* 4 id. 284; *Reformed P. D. Church, etc.,* v. *Brown,* 24 How. 76, 86; *State of Michigan* v. *Phœnix Bk.,* 33 N. Y. 10; *Crocker* v. *Crocker,* 31 id. 507; *Thompson* v. *Bank of B. N. A.,* 82 id. 1, 7; *Fabbri* v. *Kalbfleisch,* 52 id. 28; *Taylor* v. *Guest,* 58 id. 262, 265-6; *Meyor* v. *Lathrop,* 73 id. 321; *Cox* v. *James,* 45 id. 558, 559, 560; *Caswell* v. *Davis,* 58 id. 223, 229.) The insertion of the word "exchange," in the checks charged to Freer for the forbearance, did not aid the plaintiff. (*Price* v. *Lyons Bk.,* 33 N. Y. 55; *S. C.,* 30 Barb. 85; *Cope* v. *Wheeler,* 41 N. Y. 303, 309.) The agree-

ment to take ten per cent, its computation, and securing it by the mortgage, being done by the firm understandingly, establishes the intent to violate the statute. (*Friedler* v. *Darrin*, 50 N. Y. 437; *Tyng* v. *Com. Warehouse*, 58 id. 308.) The statute of usury does not permit a firm, pursuant to agreement, to loan to one of the members its money at any rate of interest in excess of that authorized by law, and a contract for that purpose is invalid. (*Melville* v. *Am. Benefit B. Assn.*, 33 Barb. 103; *Herbert, etc.,* v. *Kenton Building & S. Assn.*, 11 Bush [Ky.], 296; *Mills* v. *Salisbury B. & L. Assn.*, 75 N. C. 292; *Columbia B. L. Assn.* v. *Bollinger*, 12 Richardson's Eq. 124; *Building L. Assn.* v. *Dorsey*, 15 S. C.; Tyler on Usury, 288–9; *Cotton* v. *Dunham*, 2 Paige, 267; *Morse* v. *Wilson*, 4 Term R. 353; *Cole* v. *Reynolds*, 18 N. Y. 77.) A firm may deal with one of its members as well as with a stranger, and for that purpose its existence with its own rights and interests distinct from those of the respective members is recognized. (*Cole* v. *Reynolds*, 18 N. Y. 77; *Walker* v. *Wait*, 50 Vt. 668; *Seighartner* v. *Weissenborn*, 20 N. J. Eq. 172; *Townsend* v. *Goewey*, 19 Wend. 424, 430; Pars. on Part. 240, 241; Story's Eq. Jur., § 680; *Kingsland* v. *Braisted*, 2 Lans. 20.) A firm cannot lawfully charge its member greater than the legal rate for money loaned by it to such member, where the amount and such rate are payable at all events, and not dependent upon the trade or profits. (*Melville* v. *A. B. B. Assn.*, 33 Barb. 103; *Herbert* v. *K. B. & S. Assn.*, 11 Bush, 296; *Evans* v. *Negley*, 13 S. & R. 218, 222–3; Tyler on Usury, 289; *Quackenbush* v. *Leonard*, 9 Paige, 334, 346; *Morse* v. *Wilson*, 4 Term R. 353, 356; *Braynard* v. *Hoppock*, 7 Bosw. 157; affirmed, 32 N. Y. 571; Tyler on Usury, 284–297; *Munn* v. *Commission Co.*, 15 Johns. 44, 56; *Jones* v. *Hope*, 2 Johns. Cas. 60; *Wilkie* v. *Roosevelt*, 3 id. 66; *Williams* v. *Storm*, 2 Duer, 52; *Clark* v. *Sisson*, 22 N. Y. 312; 4 Duer, 408; *Tiedmann* v. *Ackerman*, 16 Hun, 307.)

*J. McGuire* for respondent. All moneys received by the Schuyler County Bank, whether by deposit or otherwise, be-

came the property and effects of the firm. (*Ætna Nat. Bk.* v. *Fourth Nat. Bk.*, 46 N. Y. 82; *Carroll* v. *Cone*, 40 Barb. 220; *Marsh* v. *Oneida Central Bk.*, 34 id. 298; *Commercial Bk.* v. *Hughes*, 17 Wend. 95.) An agreement between partners, or members of an association, that one of the co-partners or members may draw and use a part of the co-partnership funds and pay for the use of such sum an amount in excess of lawful interest is not of itself an usurious agreement, but one that is valid and may be enforced. (*Silver* v. *Barnes*, 6 Bing. N. C. 180; *Delano* v. *Weld*, 6 Allen, 9; *Farredy* v. *Herndon*, 1 Jacob, 144; Tyler on Usury, 185; *Burbridge* v. *Cotton*, 8 Eng. L. & Eq. 57; Gow on Partnership [2d ed.], 28; *Enderly* v. *Gilpon*, 5 B. & Ad. 954; *Morris* v. *King*, 2 Burr. 891; *Johnson* v. *P. B. Assn.*, 2 Quarterly L. J. 347; *Red Bk. Bldg. & L. Assn.* v. *Patterson*, 27 N. J. Eq. 223; *Massey* v. *Citizens' Bldg. Assn.*, 22 Kans. 624.) The firm would be liable for all debts contracted to depositors. The overdrafts mentioned in the contract would necessarily be made from money placed there by depositors, which the firm would be under obligation to pay when demanded, or from the capital of the bank; hence the capital of the firm by the overdrafts might be placed in hazard, and for that reason the transaction would not be usurious. (Tyler on Usury, 185, 186; *Quackenbush* v. *Leonard*, 9 Paige, 346.) A balance for which suit may be brought need not be a final or general balance of all the partnership accounts after a dissolution, but it is sufficient if it embraces a settlement of particular matters or a balance of specific things which the partners agree to arrange, and so far as the specific matters embraced are concerned, it is conclusive between the parties. (*Coffin* v. *Brian*, 11 Eng. Com. Law, 35; *Brierly* v. *Gripps*, 32 id. 833; *Carr* v. *Smith*, 5 Q. B. 128; *Clark* v. *Dibble*, 16 Wend. 601; *Gridley* v. *Dale*, 4 Comst. 486; Collyer on Part., § 269; *Englis* v. *Furniss*, 2 Abb. Pr. 333; *Bouton* v. *Bouton*, 40 How. Pr. 217.)

FINCH, J. Three persons formed a co-partnership for the purpose of transacting a banking business, under the name and

style, as a firm, of the Schuyler County Bank. The terms of
their agreement were fixed by written articles, providing that
the mode of conducting their business should, as far as possi-
ble, be like that adopted by regular banks; and, among other
usual and ordinary provisions, containing one out of which
has grown the present litigation. It was stipulated that "to
each or either of said co-partners there shall be allowed a rate
of six and one-half per cent on the average amount of his de-
posits, to be computed on the first Monday of January in each
and every year, and on overdrafts either and each who may
overdraw his accounts shall pay interest on the average of
such overdrafts at the rate of ten per cent per annum, to be
computed and paid on the said first day of January in each
year, but in this connection it is understood that neither of said
co-partners shall overdraw his account in said bank without
the consent of the other partners." The capital stock of the
firm, which was thus organized in 1873, and was to continue
for ten years, was fixed originally at $30,000, to be contrib-
uted in equal proportions by each of the co-partners, either in
cash, "or in good genuine notes bearing seven per cent in-
terest." George G. Freer deposited his note for the $10,000
of capital to be contributed by him; and Payne and Pellet,
the other two partners, either did the same thing, or paid
in their capital in cash; the evidence leaving room for a pos-
sible doubt, and the adverse parties here disagreeing on the
subject. The capital was afterward increased, and other part-
ners admitted, who contributed smaller amounts and in un-
equal proportions, which seem to have been paid in cash.
For a time Freer's account with the firm showed a balance
to his credit, but in June of the first year the balance shifted,
and his debtor account in the main steadily increased. This
result occurred in two ways; by his checks drawn upon the
firm which were paid when no funds stood to his credit on
his individual account, and by the payment, or, as it is claimed
on one side, by the discount of notes upon which Freer was
liable either as maker or indorser, when the balance of account
was against him. This indebtedness increased, notwithstand-

ing the annual credit of dividends, until in November of 1876 the balance against him, as shown by the books of the partnership, was over $50,000, and on the tenth of that month he gave to Payne, one of the partners, as trustee for the firm, his bond and mortgage for $52,383. The business continued thereafter until April, 1878, when the co-partnership was dissolved by the death of Freer. Thereafter Payne, as trustee, began a foreclosure of the mortgage by suit in equity, alleging simply a default and no special·needs of the partnership, and seeking no final accounting. The principal defense was usury, and it is that which presents the important question as to which the courts below have differed; the Special Term sustaining the defense as to the notes, and the General Term rejecting it wholly.

As between a banking firm and a depositor not a member of the firm, an overdraft is a loan. The payment of the latter's check when no funds stand to his credit is an advance by the firm of its own money, for the repayment of which, with the lawful interest,·the customer is liable. It is payable absolutely and in full, without abatement or contingency, and so constitutes a loan in all its characteristics. If more than the legal rate of interest is agreed upon and paid, the borrower loses the excess above such legal rate, and if the contract stands and is carried out the loss is absolute and certain. But the situation changes when the person making the overdraft is a member of the firm which advances it. If he is charged merely the legal rate of interest while the net profits of the business are larger, to the extent of his overdraft he has withdrawn his own capital while sharing, as if he had not, in the profits earned by the remainder. If his overdraft equals his capital, his entire contribution as partner to the profits earned would be six per cent, while that of his co-partners might be ten or twenty per cent, and equality of division would be a wrong and injustice to them. By such process he could lend his capital withdrawn by overdraft, and with the six per cent thus earned pay the interest on the overdraft, and then, out of the partnership profits, get, not only lawful interest upon his share of the capital, but a proportionate part

of the excess earned by the capital of his associates, and so receive profits to the earning of which he had contributed nothing; reap where he had not sowed. Instead of such an arrangement the associates would be likely to dispense with the costly and useless co-partner, and, borrowing at six per cent an amount equal to his capital, pay but lawful interest for its use, and keep the excess of earnings for themselves instead of bestowing it as a gratuity. When, therefore, a banking firm is organized, equality and justice require that this possible evil should in some manner be prevented. It may be accomplished by provisions which forbid overdrafts. But is that, necessarily, the sole remedy? If every overdraft is charged with a rate of interest which equals the rate of profit, or as nearly so as can be estimated in advance, the inequality and injustice is redressed. But if such an arrangement is a loan, in any just and proper sense, and the rate allowed is interest for the use of money, the transaction is usurious; and right here comes the collision of the respective litigants. Is such an arrangement, therefore, a loan of which usury can be predicated? If the partner who makes the overdraft is a borrower he is, at least, that kind of a borrower who to some extent borrows of himself. He has an interest in the fund which he receives and whatever he pays goes in part to himself. This fact interweaves his debt, so far as it is one, with the business results and risks. To call his overdraft a loan, and hold it tainted with usury is, in practical effect, to say that one may take usury of himself. As a borrower he is a victim of usury, while as a lender he is one of the usurers. One who has paid usurious interest may sue to recover it back, but if he has paid it to himself jointly with others, his co-partners, he must sue himself jointly with them if he sues the firm. Such an action would be at least a novelty. The taking of usury corruptly and in violation of the statute is a criminal offense. If this overdraft was a usurious loan the offense was committed by the firm. It was done in pursuance of an agreement in which all joined. If there was crime in it all were criminals alike, and yet one of the three must be held guiltless, although equally guilty with the rest, or else be

convicted of taking usury of himself. The difficulties thicken as we examine the transaction more closely and trace out its ultimate results. It is said that the advance to Freer was a loan because both principal and interest were payable absolutely and without contingency by the borrower. But, disregarding for the present the subsequent promise contained in the mortgage, and confining our attention to the nature of the overdrafts, let us inquire when and how the advance was payable. The provision for interest implies credit given for some length of time, although no time was expressly named. But the agreement provides, first, that each co-partner shall be allowed interest on the *average* amount of his deposit, "to be computed on the first Monday of January in each and every year." That necessarily means each and every year during the continuance of the partnership and until its close, and dictates the mode of keeping the individual accounts. And in like manner the stipulation that ten per cent should be charged on the permitted overdrafts, to be computed and paid "on the *said* first of January in each year," means each year during the continuance of the partnership, and necessarily implies that the principal of the overdraft is payable only at the close of the partnership or upon an earlier adjustment of its affairs. Before such accounting is the advance even a debt? It was said in *Bouton* v. *Bouton* (40 How. Pr. 218, citing Story on Part., § 348) that "if any partner has made advances to the firm and others have received advances from it, these do not constitute debts, strictly speaking, till the concern is wound up." What is meant is, and such must be the result inevitably, that the advances are only payable upon an adjustment of the partnership accounts, and until then constitute no debt, and may never; for that adjustment may show nothing due from the alleged borrower. (*Richardson* v. *Bank of Eng.*, 4 Myl. & C. 165; *Crawshay* v. *Collins*, 15 Ves. 218.) The principal, therefore, is payable, not absolutely, but upon a contingency which is the business risk. Possibly this may seem clearer and more certain if we test it by some simpler state of facts than those before us. Suppose each partner has paid in $10,000, and then the one who overdraws does so

to the exact extent of his capital paid in, let us see what the ultimate results may be. If the firm reaches the end of the partnership term, or a point of settlement, voluntary or compelled, with the overdraft outstanding, and with net annual profits of ten per cent, what is it which happens to the alleged borrower? If he is to be debited with his overdraft, he is to be credited with his capital to be returned, and so far as the principal of his overdraft is concerned he owes nothing and has none of it to pay. He has simply withdrawn his capital in advance; not borrowed it, but taken in advance and earlier than he ought what was all the time and ultimately his own, subject to the business needs and risks. Then as to interest. He stands charged with ten per cent, but is credited with ten per cent on the same amount as profits. As matter of form he has paid ten per cent for the use of the firm's money. As matter of fact he has simply had the use of his own money, and neither gained nor lost a dollar by force of the transaction; so that in the supposed case, neither the principal nor interest were in fact paid or even payable. The loan and the usury had no existence except formally in the accounts and as matter of book-keeping. What would have been a loan and must have been usury is divested wholly of the characteristics of each by the relations existing between the parties.

But the precise case we have used as an illustration can rarely happen. The rate of profits to be earned in the future cannot be accurately known and may prove to be more or less than the estimated rate; and the overdrafts of a partner may be less or largely more than his contributed capital. These uncertain elements change the true character of the transaction only in the respect that they weave into it the hazards and contingencies of the business, and so furnish one of the reasons for rejecting the defense of usury. While for the purpose of adjusting the accounts an agreed rate is charged, it does not follow that such rate will be in fact paid. If the profits earned exceed the estimate, the advantage is on the side of the partner who has overdrawn, for having contributed to profits the smaller sum he shares in the larger earnings; while on the.

other hand, if the profits of the business are less, he has lost by an estimate which was too large. Until a final settlement of the accounts it will be impossible to tell how much he has in fact paid for the use of his capital withdrawn, or how much of the principal he will be compelled to restore, since both are interwoven with the contingencies and hazards of the business and are dependent upon its results. What the borrowing partner does is not to pay ten per cent for the loan of money, but rather to make a contribution to profits equal to the estimated earning power of the capital withdrawn, and belonging in part to himself as one of the firm. Or, to state it in another form, he agrees that from his share of dividends shall be deducted, or to the partnership assets shall be added, ten per cent upon his overdrafts in arriving at a settlement of the partnership affairs. Until then he owes nothing. It is impossible to call such a transaction an usurious loan, if the view we have taken be correct, and will bear the test, when confronted by one further criticism of the learned counsel for the appellant. Briefly stated, it is this: a firm may contract with an individual member; that contract may be enforced in equity, although in the process such member sues himself; when the firm seeks to enforce it the capacity to make and the validity of the contract is asserted; and the individual member may meet the attack, with any defense which would be open to a stranger. We are unwilling, for the present, to admit the foundation upon which this argument rests, notwithstanding the authorities cited in its support. (*Cole* v. *Reynolds*, 18 N. Y. 77; *Walker* v. *Wait*, 50 Vt. 668; *Sieghortner* v. *Weissenborn*, 20 N. J. Eq. 172; *Townsend* v. *Goewey*, 19 Wend. 424; Pars. on Partn. 240, 241; Story's Eq. Jur., § 680; *Kingsland* v. *Braisted*, 2 Lans. 20.) It is not easy to see how, even in equity, the firm, as such, could effectively have sued Freer for the advances. (*Richardson* v. *Bank of Eng.*, *supra.*) But we need not answer that question, nor determine any thing on the subject; for, conceding the appellant's claim in this direction, it shows only that Freer could avail himself of any defense open to a stranger, but does not show that what

would be usury between the firm and a stranger is also usury between the firm and one of its members, and does not establish that what would be a loan if made to a third person may not be something very different if made to a partner. So that the ultimate question remains the same.

We may now consider the authorities to which we have been referred, and see how far our judgment of the inherent nature of the transaction is sustained. The earliest of the cases cited is that of *Silver* v. *Barnes* (6 Bing. N. C. 180). The defendant was a member of a mutual benefit society, whose funds were raised by joint contributions under its rules and regulations, and were loaned at five per cent interest, but to the person who bid the highest premium for the loan. Defendant borrowed £80, paying therefor a bonus of more than £15. The court said : " The question was whether the transaction was a loan of money, or a dealing with the partnership fund. If it was a loan it was usurious. We think it was a dealing with the partnership fund in which the defendant had an interest, in common with the other members of the society, and that it was not a loan. The defendant was interested in the money when it was advanced, and when it was repaid." It is to be observed that in this case the form of the transaction was that of a loan. The society assumed to lend, and the subscriber to borrow. A period of credit was fixed and the running rate of interest prescribed. And yet, looking beyond the form of the transaction, and considering its substance, the court ruled it was not a loan, founding its conclusion upon the fact resulting from the partnership, that the alleged borrower was interested both ways; as well in the money paid, as in that received. The criticism of the learned counsel for the appellant, upon this case and others like it, does not parry its force. He argues that there was no agreement to pay more than the lawful rate of interest which was fixed at five per cent. But there was an agreement to pay and an actual payment of a premium or bonus, in excess of the lawful interest, as a condition of the loan. It is our common experience that usury is generally secured by that method. And the court assumed

what could not be denied: that the arrangement, if in fact a loan, was void for usury. This case was followed by others, differing in their circumstances and characteristics, not always exactly pertinent, but recognizing and confirming the fundamental doctrine of the principal case. (*Fereday* v. *Hordern,* 1 Jacob, 144; *Gilpin* v. *Enderbey,* 5 Barn. & Ald. 954; *Morisset* v. *King,* 2 Burr. 891; *Burbidge* v. *Cotton,* 8 Eng. L. and Eq. 57; *Delano* v. *Wild,* 6 Allen, 9; *Bowker* v. *Mill River Loan Fund Association,* 7 id. 100; *Merrill* v. *McIntire,* 13 Gray, 157; *Red Bank Mut. B. and L. Ass'n* v. *Patterson,* 27 N. J. Eq. 223; *Massey* v. *Citizens' B. Ass'n,* 22 Kans. 624.) It is claimed, however, that the current of authority is broken by decisions holding a contrary doctrine, one of which is in our own State. (*Melville* v. *American Ben. Build. Ass'n,* 33 Barb. 103; *Herbert* v. *K. Build. and Sav. Ass'n,* 11 Bush, 296; *Mills* v. *Salisbury Build. and L. Ass'n,* 75 N. C. 292; *Columbia Build. and L. Ass'n* v. *Bollinger,* 12 Rich. Eq. 124; *Build. and L. Ass'n* v. *Dorsey,* 15 So. Car. 462.) The first of these cases recognizes the doctrine we have approved, but denies its application to the case before the court. It holds distinctly that the transaction was not usurious if it was a dealing with partnership funds, but only in case it was a loan; and then proceeds to analyze the complicated and confused rules of the society, and evolves the conclusion that they were framed to evade the law against usury, and that the advances made were loans in disguise. Whether that conclusion was right or wrong, the case recognized the doctrine we have been considering. The same observation applies to the cases in Kentucky and North Carolina. In each the societies defending were corporations, but charged to be mere covers or devices for lending money at unlawful rates, and not within the purpose or intent of the statute which permitted such organizations. The case of the *Columbia Build. and Loan Ass'n* v. *Bollinger,* decided in South Carolina, went further. It questioned the doctrine of *Silver* v. *Barnes;* intimated that it failed to explain the principle on which it was founded; and asserted an inability to discern how treating the

transaction as a partnership dealing "could have sanctified" the taking of excessive interest. The case of *Dorsey* in the same State was decided later, and merely followed the precedent established. All of these cases had to deal with the varying and often complicated facts and conditions growing out of the manner in which the associations involved were organized and operated. None of them arose in the simpler form of an ordinary partnership, providing in good faith and with reasonable business prudence, for the case of overdrafts by individual members. There was here no device or subterfuge to evade the usury laws in the making of the original agreement. The trial court found that explicitly, and held that the reservation of ten per cent upon the overdrafts contemplated by that agreement was not usurious. Upon principle and authority we are satisfied with that conclusion.

But the trial court also held that other and subsequent transactions were not within the scope of that agreement, and infected with usury the mortgage given in part for their security.

In considering this branch of the case we may confine our attention to the Hill notes, for if these were not outside of the general partnership arrangement, it is safe to conclude that none of the other transactions were.

When that partnership was formed there was outstanding in the hands of the First National Bank of Watkins a note of $5,000, made by Hill, and indorsed by Freer, which, as between maker and indorser, was understood to be payable by the latter, and was being carried on his credit and for his convenience. This note was renewed from time to time, and one of the renewals fell due after the note had been transferred to the Bank of Penn Yan, and after the partnership was formed. On the second day of July it was paid by the Schuyler County Bank out of the co-partnership funds ; presumably, and without doubt at the request of Freer and for his benefit. Stopping at that point, this payment was clearly an overdraft, even within the definition of the Special Term. It was money of the partnership, withdrawn at his individual request, and applied to his

individual use. It does not matter that the request was oral and not in the form of a check. The inherent character of the overdraft is not affected by that circumstance. Nor is it of consequence that the money was delivered to Freer's creditor, or was used to pay Freer's debt. It was none the less an advance to him, and the use to which he appropriated it concerned only himself. It was an advance made, so far as the evidence discloses, without any new or special agreement. It was, therefore, under the partnership contract, controlled by its terms and chargeable in the partnership accounts with the ten per cent reserved, and an overdraft within the meaning of the original agreement. It was thus not usurious, and when absorbed in the mortgage, precisely upon the same terms with other overdrafts, could not taint that instrument with usury. What followed we do not deem material, since it respected only the form of carrying the overdraft and getting it upon the books, and not at all the substance of the transaction. At first it was not charged to Freer in his individual account, probably from an expectation that it would soon be repaid, and for a time it was noted upon a slip and treated as a cash item. But in a brief period a new note of $5,000, signed by Hill as maker and Freer as indorser, was substituted for the slip. This note was given for six months and must have been dated July 2, 1873. On the 10th of November, 1873, the bank charged to the account of Freer the interest at ten per cent to January 7, 1874. Whenever renewed, the same process was repeated until the 10th of November, 1876, Pellet occasionally drawing a check for the interest, to which he signed Freer's name, and the one note being divided into two of equal amount, and the whole principal due being charged to Freer at the last-mentioned date in his individual account. These renewals were plainly not intended as loans or discounts. The advance was made at the beginning, and the notes were taken, not as payment, but as so many promises to pay, the interest charged in the individual account, and the advance itself charged when there seemed no longer hope of the notes themselves being paid. As to some of these renewals the trial court finds that they involved a vio-

lation of the law and were founded upon a corrupt agreement, but such finding cannot be true if the transaction was not a loan, and is based upon a conclusion that it was. We think differently. It seems to us clear that the advance was made out of the funds of the partnership, as a partnership transaction, and under the partnership agreement, and what occurred afterward was an endeavor, as that agreement prescribed, to assimilate the form of the advance and the mode of carrying it to the methods of regular banks without at all changing the substantial nature and character of the transaction. We think, therefore, the General Term correctly held that the mortgage was not usurious.

The order of the General Term should be affirmed and judgment absolute ordered for the plaintiff upon the stipulation, with costs.

All concur, except RAPALLO, J., absent.

Order affirmed, and judgment accordingly.