(64 App. Div. 393.)

### ASPELL v. CAMPBELL.

(Supreme Court, Appellate Division, Second Department. October 4, 1901.)

INSANE PERSON—COMMITTEE IN LUNACY—ASSETS—FRAUDULENT MISAPPROPRIATION—EVIDENCE—SUFFICIENCY.

On December 19, 1861, defendant, as committee in lunacy of plaintiff, sold 100 shares of railroad stock, assets of the estate, at $30 per share. On January 8, 1863, plaintiff was adjudged compos mentis on affidavits of defendant and defendant's brother, to whom the stock had been sold. In an accounting with plaintiff on that date, defendant informed him of the transaction as occurring in 1861. The only account book kept by defendant, and his settlement made in court, showed the transaction as of that date. He afterwards repeatedly insisted that the sale occurred in 1861, and so stated in his sworn answer in the suit. At various subsequent times he gave plaintiff sums of money, and at one time took a receipt in full of all demands. The only evidence that the sale of stock occurred April 14, 1862, at which time the stock was worth $45 a share, was the indorsement bearing that date on the back of the certificates. *Held*, that the evidence was insufficient to charge defendant with the fraudulent misappropriation of the difference in price.

Sewell, J., dissenting.

Appeal from judgment on report of referee.

Equitable action by Thomas J. Curtice, revived in behalf of Josephine Aspell, against Emma L. Campbell, as administratrix de bonis

non of the estate of Lewis M. Jayne, deceased, to charge decedent, as committee in lunacy of Curtice, with fraudulent misappropriation of assets. From a judgment entered upon the report of a referee in favor of plaintiff, both parties appeal. Reversed on consideration of defendant's appeal.

Argued before GOODRICH, P. J., and WOODWARD, JENKS, and SEWELL, JJ.

John J. Lamoree, for plaintiff. .

Henry Bacon (John J. Beattie and Joseph Merritt, on the brief), for defendant.

WOODWARD, J. Counter appeals are before us in the record, but, in view of the conclusion we have reached, it will not be necessary to consider the question raised by the plaintiff's appeal, and the discussion will relate, therefore, to the facts developed upon the trial of the cause before a referee, in which the defendant is held to be liable for $750, with interest, which sum it is alleged the defendant fraudulently retained out of the receipts of the estate of a lunatic of whom the original defendant in this action was the committee. It seems entirely clear to us that the matters set forth are of equitable cognizance, and we have no doubt, if the plaintiff's theory of this case is supported by the evidence, that a right of recovery exists, and that it is not barred by any statute of limitations. Disregarding all merely technical matters in so far as they relate to the plaintiff's case, and without giving anything more than an equitable consideration to the important question which was raised upon the death of the original defendant without an opportunity to be heard in explanation of the matters as to which he is alleged to have made admissions against his interest to the original plaintiff, all of which matters were in evidence, let us consider the merits of this case, to the end that we may determine whether the high offices of a court of equity may be properly invoked in aid of the plaintiff. In 1858, Thomas J. Curtice, a resident of the village of Florida, Warwick township, Orange county, was adjudged to be a lunatic, and Lewis M. Jayne was duly appointed committee of such lunatic, giving a bond in the penal sum of $25,-000 for the faithful discharge of the duties of the trust. Mr. Curtice was confined in an asylum for a period of several years, but on the 8th day of June, 1863, upon his petition, supported by the affidavits of Mr. Jayne, his committee, Dr. Jayne, a brother of the committee (who is incidentally involved in the controversy as will hereafter appear), and others, he was adjudged to have recovered his mental faculties, and a supersedeas was duly entered, Mr. Curtice coming into the immediate possession of his property. On the day on which the order of the court was made superseding the commission in lunacy, Mr. Jayne had a settlement of his accounts with Mr. Curtice, in which a detailed statement of all transactions with the property of Mr. Curtice during the period of his lunacy was made to the latter, and the money and property then in the possession or control of the committee was turned over to Mr. Curtice. According to the statement made to Mr. Curtice, which is in harmony with the only account book which appears to have been kept, and with the

sworn statement made and filed with the clerk of the courts of
Orange county on the 17th day of March, 1863, Mr. Jayne, on the
19th day of December, 1861, sold 100 shares of stock in the Cleve-
land & Toledo Railroad Company, par value $50 per share, for
$1,500, or at the rate of $30 per share; and Mr. Curtice, in an affi-
davit made in the present action, says in reference to this transaction
that at the time of the settlement Mr. Jayne said to him: "Thomas,
I am very sorry that I have sold your railroad stock, but it is all gone.
I sold the last hundred shares December 19, 1861,  *  *  *  and I
have credited you with the full amount in each case.    I did so at the
date when I sold and assigned the stock.    I assigned the last 100
shares to De Witt C. Jayne, December 19, 1861, and the stock was
very low at that time."    In this account Mr. Jayne charged himself
with the amount realized for the stock, as well as the interest up to
the day of the annual statement of the account on the 14th day of
April, 1862, and from the date of the settlement in 1863 up to the 16th
day of June, 1887, no complaint was heard by any one, so far as the
record discloses, that the settlement was not fair, just, and equitable
in every respect.    On the date last above mentioned Mr. Curtice tes-
tifies that he went to Mr. Jayne, and complained to him that there
was a discrepancy in the books, something very wrong; that he
(Curtice) had discovered that Mr. Jayne had not sold the 100 shares
of stock in the Cleveland & Toledo Railroad Company on the 19th
day of December, 1861, but that the stock was actually sold on the
14th day of April, 1862, at which time the price had advanced to $45
per share, making a difference of $750 in the transaction; and this
is the basis of the recovery in the present action, all of the other
alleged causes of action set up in the complaint having been either
abandoned or disregarded by the learned referee.    It is claimed that
at this meeting Mr. Jayne, without admitting any liability, or that the
stock was sold on any other date than that mentioned in the sworn
report filed with the clerk of the court, gave to Mr. Curtice a note of
the latter, payable to Mr. Jayne, for $200, upon which there was $12
of interest due, with $100 in cash, making a total of $312, and that
Mr. Curtice thereupon gave a receipt in full of all demands to June
17, 1887.    In fact, it is conceded that this transaction took place.
Nothing more appears to have been done until about the 10th of Feb-
ruary, 1888, when Mr. Curtice employed an attorney, a Mr. Rowe,
and the latter visited Mr. Jayne.    The interview appears to have re-
sulted in nothing substantial to Mr. Curtice, though the testimony
of Mr. Rowe is replete with matters of a general nature, which might
be construed into admissions; and subsequently Mr. Jayne gave Mr.
Curtice various sums of money, aggregating, with the amount al-
ready mentioned, $1,042.    The first of these, subsequent to the trans-
action in 1887, was $250 in April, 1892; the second, $250 in August,
1892; and the third, $230 in May, 1893.    In September, 1893, Mr.
Curtice brought the present action against Lewis M. Jayne.    Issues
were joined on the 25th day of September, 1893, and the case was
subsequently, by consent, referred to Hon. T. F. Bush to hear and
determine.    The cause was on trial until some time in September,
1896, when the plaintiff rested, and a motion was made to dismiss the

complaint, which motion was duly argued, and decision reserved by the learned referee, the further hearing of the case being adjourned. Before a decision of this motion was reached, and in the month of November, 1896, the defendant, Lewis M. Jayne, died intestate, a resident of the county of Orange. Thereafter Frank H. Campbell was duly appointed administrator of the goods, chattels, and credits of the said Lewis M. Jayne, and subsequently motion papers were served on the attorney for said Jayne, but without notice of the administrator; and on or about the 1st day of May, 1897, and without any appearance upon the part of the attorney for the said Lewis M. Jayne, an order was made reviving the action, and substituting the said Frank H. Campbell as administrator, etc., in the place and stead of the said Lewis M. Jayne. The representatives of Mr. Jayne refused to recognize the validity of this order, resulting in subsequent proceedings, and the entry of an order of substitution of a like tenor; and, a motion having been made to set aside such order, and refused, an appeal was taken, which has not as yet been determined. The referee, after the denial of the motion to set aside the substitution of the said Frank H. Campbell, fixed a time and place for the further hearing of the case, and, upon the parties appearing, such proceedings were had as resulted in a submission of the issues arising therein to the said referee. In August, 1898, the referee rendered his decision, the judgment was perfected on the 19th day of December, 1898, and both parties are now before this court appealing from such judgment. After the appeals had been taken, and on the 8th day of October, 1899, Thomas J. Curtice, the original party plaintiff, died. Prior to his death Mr. Curtice assigned the cause of action set forth in the complaint to his niece, Josephine Aspell, the present plaintiff, who was duly brought into the case. Later Frank H. Campbell died, and Emma L. Campbell was given letters of administration de bonis non on the estate of Lewis M. Jayne, deceased, and an order was subsequently made reviving and continuing the action and the appeals herein, and substituting the said Emma L. Campbell, as administratrix de bonis non of the estate of Lewis M. Jayne, deceased, as sole defendant and appellant herein.

This, briefly, is the history of the devious ways through which this litigation has come down to us from the first half of the past century, and we are to inquire whether the evidence supports the conclusion that Lewis M. Jayne, the friend and committee of Thomas J. Curtice, nearly half a century ago, while the latter was confined as a lunatic, corruptly appropriated to himself the sum of $750, which belonged to the estate in his custody. The complaint alleges a conversion of certain bank notes, somewhat mutilated by fire, owing to the plaintiff's action while mentally unsound; the conversion of the profits, or the wrongful deprivation of the profits, to the plaintiff, on 130 shares of railroad stock, the amount of such wrongful transaction being placed at $5,785; and the conversion of $750 upon 100 shares of railroad stock. The referee refuses to find anything due to the plaintiff on either of the first alleged causes of action, and as to the third he admits that there is "no direct positive proof that the committee actually received the sum of $2,250 on the sale of the stock

to his brother, but that was the market price of the stock at the time
he made the sale, and upon the assumption that he acted honestly
and in good faith it must follow that he did not make the sale for less
than the stock was selling for in the market." But what is the evi-
dence in support of the proposition that $2,250 was the market price
of this 100 shares of Cleveland & Toledo Railroad stock at the time
he made the sale to his brother? It is probably established by the
evidence that the market price of this stock on the 14th day of April,
1862, was $45 per share, making $2,250 for the 100 shares, but the
original defendant, in his sworn statement made on the 17th day of
March, 1863, says that this sale was made on the 19th day of Decem-
ber, 1861, at which time it is conceded that the stock was worth only
$30 per share, or $1,500 for the 100 shares; and this amount, with
the interest, was accounted for to Mr. Curtice on the 8th day of June
following, at which time Mr. Curtice admits that the matter was spe-
cially called to his attention, and that Mr. Jayne told him the stock
was low at the time of the sale. It should be remembered that at
the time this sworn statement was made Mr. Jayne knew that Mr.
Curtice was regaining his mental equilibrium, and that he was likely
at any time to be restored to his estate, and to be put into position
where he could inquire into the fidelity of his committee; for we find
him, in an affidavit in support of Mr. Curtice's petition to be relieved
of the commission in lunacy, saying, under date of May 30, 1863,
that "the said Thomas J. Curtice has been fully restored to a sound
mind and understanding, and has become and is fully competent to
manage himself, and take charge of his business and affairs, as de-
ponent verily believes from the conduct and conversation of the said
Curtice," and that "the said Curtice has been in such state of sound-
ness of mind since the month of January last past; that deponent has
since the period last mentioned been a great deal in the society of
the said Curtice, and made a very careful observation of the con-
dition of his mind, and that deponent has not seen, since the time last
mentioned, any symptoms of mental derangement." To the same
effect is the affidavit of Dr. Jayne, a brother of the committee, who
was the purchaser of the stock; and, leaving out of the consideration
all of the legal presumptions, is it reasonable to suppose that a man
of good standing, who was able to give a bond for $25,000, would
make a false statement of his account at a time when he knew that
his ward was in a sound state of mind, likely at any time to be at
liberty, and that he would, with his brother, take an active part in
restoring his ward to the custody and control of his property, if there
was a consciousness on his part of having done a wrongful or illegal
act? The evidence relied upon by the learned referee in support of
the proposition that the sale was made when the stock was worth
$2,250 is found in the date of the assignment of the stock certificate.
"I am convinced by the evidence given," says the learned referee in
an opinion handed down, "that this stock was sold in April, 1862,
and that the entry of the sale as made in the account of the commit-
tee was not truthful;" thus practically convicting the original defend-
ant (hereafter for convenience and brevity referred to as the "de-
fendant") of a crime, and the reason for this conviction is given that

this is substantially shown by the written transfer on the back of the certificate bearing that date. The assignment does not have the appearance of having been executed in blank, so that it might pass by delivery from one to another, as is claimed by the learned counsel for the defendant; on the contrary, it seems to have been entirely completed with the same ink, and at the same time. Assuming this to be the case, we are unable to agree with the learned referee that this is sufficient evidence to support the conclusion that the defendant committed a crime by a falsification of his books and the making of a false report under oath in respect to the property under his control. The defendant sold this stock to his brother, and the referee goes out of his way to say that "there is no evidence of a fraudulent scheme on the part of the committee, nor of any corrupt agreement or understanding between him and his brother, to whom he made the sale, by which the committee was to profit by the sale, and no evidence to indicate an intention on his part to aid the purchaser through a fraudulent transfer of the stock." It is entirely consistent with common experience that in dealings of this character the property purchased is not always delivered immediately. The parties lived in a small rural community, and, while the stock certificate was nominally in the possession of the defendant at the time of the alleged sale, it is by no means certain that it was not actually on deposit in the city of New York, or some other point, for safe-keeping; and if the defendant's brother purchased the stock on the 19th day of December, relying upon his brother to deliver the same upon demand, there is no reason why the certificate might not have been dated on the 14th day of April, 1862, and yet the statement made in the report, and which constituted the basis of settlement, be entirely true, both in letter and in spirit. This theory of the matter is entirely consistent with the claim of the defendant, testified to by Mr. Rowe, the attorney for Mr. Curtice, that he made a written agreement with his brother for the sale of the stock on the 19th of December, 1861. In answer to the question, "He didn't admit that it was true that he sold the stock in April?" Mr. Rowe says, "No, sir; he admitted that he sold it in December, and that it was delivered or transferred in April." It is a coincidence of some importance in the consideration of the good faith of this transaction that the date of the transfer of this certificate is the date of the annual accounting. The estate of Mr. Curtice came into the control of Mr. Jayne on the 14th day of April, 1853, and all of the several annual reports are made as of the anniversary of that date, so that the report for the year 1862 bears date of April 14th; and it may well be that in charging himself with the interest upon the amount of the proceeds of the railroad stock from the 19th of December to the 14th of April, 1862, the matter of the transfer was brought to the mind of the committee, and the certificate was filled in as of that date. This would close the transaction for the year; and the very fact that it is dated on this day, when, under the law in this state, it is neither necessary to date nor to fill in the blanks in order to convey a full legal and equitable title to the stock (McNeil v. Bank, 46 N. Y. 325, 330, 331, 7 Am. Rep. 341, and authorities there cited; Knox v. American Co., 148 N. Y. 441, 454, 42 N.

E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700), shows a degree of
frankness on the part of the defendant wholly inconsistent with the
idea that he was engaged in a fraudulent enterprise against the estate
of his ward.   There are so many things which might have operated
to delay the transfer, all of them consistent with absolute honesty,
and the evidence is so devoid of any suggestion of collusion, or of any
effort on the part of the defendant to cover up any of his transac-
tions, that the case is fairly within the rule that, where the natural
inference from the proofs made does not necessarily lead to the pre-
sumption of a fraudulent intent, but the evidence relied upon is
equally as consistent with innocence as with wrongdoing, that con-
struction must be placed upon it which will exonerate the party im-
plicated from a dishonest intent.   Constant v. University, 133 N. Y.
640, 648, 31 N. E. 26, and authorities there cited; Crook v. Rinds-
kopf, 105 N. Y. 476, 485, 12 N. E. 174, and authorities there cited;
Bernheimer v. Rindskopf, 116 N. Y. 428, 436, 22 N. E. 1074, 15 Am.
St. Rep. 414; Roberts v. Buckley, 145 N. Y. 215, 224, 39 N. E. 966,
and authorities cited.   The important question to be determined, and
upon which must stand or fall the cause of action asserted by the
plaintiff, is not when the transfer of the physical possession of the
stock certificate was made, but when the sale was made, and the
money paid over to the committee.   If Dr. Jayne purchased this
stock on the 19th day of December, 1861, and the money was paid
over to the committee on that date, he became the equitable owner of
the stock, and the question of what particular time this equitable title
was transformed into a legal title is of no possible consequence in
this case.   The certificate, with the date of its assignment, carries
with it the legal presumption that it was transferred upon that date
(1 Rice, Ev. §§ 56, 152a, 152b), but it raises no presumption that the
consideration was paid at the time of the transfer which can overcome
the presumption of innocence on the part of the defendant (Id. p. 96,
§ 59,—where the rule is laid down that, where there are conflicting
presumptions, the presumption of innocence will prevail against the
presumption of the continuance of life; the presumption of the con-
tinuance of things generally; the presumption of marriage, and the
presumption of chastity); and there is absolutely no evidence in the
case to dispute the repeated assertions of the defendant under oath
and in his general conversations, which are found in evidence, that
the sale was made upon the 19th day of December.   The defendant's
books show this.   He charges himself with interest from this date.
He stated this fact in his sworn report in March, 1863.   He stated it
in his settlement with the original plaintiff in the same year.   He
made the same statement to Mr. Rowe.   He denied the allegations
of the complaint upon this point under oath, and on no occasion did
he admit that there was anything false or misleading in his accounts.
The evidence remains absolutely undisputed that the sale was made
on the 19th day of December, 1861, and that the proceeds of such
sale came into the hands of the defendant, as committee of Mr. Cur-
tice, on that day, and that the estate has had the benefit of that fund
from that date to the present time.   The only fact which in any man-
ner weakens this defense is that the certificate of stock was not phys-

ically transferred to the purchaser until the 14th day of April, and the possible inference that the money was paid at the time of the transfer. This inference is overcome by the uncontroverted testimony of the sworn statement and the presumption that the defendant did not commit a crime. It is a well-established rule that fraud cannot be presumed; it must be proven; and, if there is left room for the inference of an honest intent, the proof of fraud is wanting. Bernheimer v. Rindskopf, 116 N. Y. 428, 436, 22 N. E. 1074, 15 Am. St. Rep. 414, and authorities there cited. Room must be allowed for honest mistakes, and possibly, even, for careless and thoughtless error (Roberts v. Buckley, 145 N. Y. 215, 224, 39 N. E. 966, and authorities cited), and at most this seems to have been the extent of the defendant's offending. If there is any doubt as to whether the sale was made in the manner and at the time stated by the defendant in his sworn report, and which is nowhere disputed except by an inference, the presumption of innocence should prevail. Shultz v. Hoagland, 85 N. Y. 464, 472. The defendant is presumed to have done his duty (Cahill v. Hilton, 106 N. Y. 512, 517, 13 N. E. 339; Forbell v. Denton, 53 App. Div. 402, 406, 65 N. Y. Supp. 1120, and authority there cited), and, the evidence being capable of an interpretation which makes it equally as consistent with the innocence of the accused party as with that of his guilt, the meaning must be ascribed to it which accords with his innocence, rather than that which imputes to him a criminal intent (Morris v. Talcott, 96 N. Y. 100, 107).

When we consider that the plaintiff has had the advantage of all of the testimony of Mr. Curtice without an opportunity for explanation or repudiation by the original defendant, who died while the case was being tried, and that the evidence thus brought before the referee does not reach the fair requirements in an action depending upon fraud as the basis of recovery, it will not be doubted that it is the duty of this court to reverse the judgment. This conclusion is reached without taking into consideration the fact that all of the matters alleged in the complaint were called to the attention of Mr. Curtice at the time of the settlement in 1863, and it is rather late in the day to ask for the interposition of a court of equity. If there were any suspicious circumstances, they were present in 1863. The original plaintiff knew that stocks had been advancing in nominal price under the stimulus of an inflated currency. He knew that he had stocks. He knew that they had been sold, and he knew that they brought a less price than the market figures which were prevailing at the time of the settlement. It would not be a harsh rule if the courts at this late day should refuse to give aid to a claim which has no better foundation, and which might, in the exercise of reasonable diligence, have been developed at a time when the evidence to establish the facts was within the reach of both parties. The referee says: "I do not regard the payments which were made in 1887, 1892–93, nor the receipts for the money paid, which were executed by the plaintiff at that time, of any binding force as a recognition or revival of the plaintiff's claim, nor as a compromise or accord and satisfaction. Those transactions were of an informal and indefinite character,"— and in this we are in accord. The defendant at the time of these

transactions was apparently a garrulous old man, who seems to have been good-natured, and inclined to do something to relieve the wants of his old-time friend. He may even have felt a certain moral obligation to make good some of the losses growing out of the untimely sale of the railroad stocks of his ward, and to this sentiment may be traced all of the so-called admissions of the defendant; but they have no direct relation to the transaction in reference to the 100 shares, as to which alone the judgment relates. It is not necessary, therefore, to devote any further consideration to this branch of the case, which is open to all of the objections to testimony as to oral admissions (1 Greenl. Ev. [Redf. Ed.] § 200), and which does not, at best, reach the crucial question in this case.

The judgment appealed from should be reversed, and a new trial granted; costs to abide the final award of costs. All concur, except SEWELL, J., who dissents.