JESSE S. PHILLIPS, as Superintendent of Insurance of the State of New York, Respondent, *v.* UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant.

Third Department, March 8, 1922.

**Principal and surety — fraud and deceit — surety company not liable on its bond guaranteeing payment of deposits in bank where obligee of bond fraudulently conceals insolvency of bank when procuring bond.**

There can be no recovery on a bond of a surety company, procured by an insurance company to guarantee the payment of its deposits in a bank, where the evidence shows that, at the time the bond was procured, the insurance company, through its officers, had full knowledge that the bank was insolvent, which knowledge it fraudulently concealed from the surety company.

KILEY, J., dissents, with opinion.

APPEAL by the defendant, United States Fidelity and Guaranty Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Albany on the 13th day of July, 1921, upon the decision of an official referee appointed to hear and determine the issues.

*Ainsworth, Carlisle, Sullivan & Archibald* [*Charles B. Sullivan* of counsel], for the appellant.

*Edward O'Malley* [*John H. Corwin, Clarence C. Fowler, M. J. Wright* and *William H. Galentine* of counsel], for the respondent.

H. T. KELLOGG, J.:

The plaintiff, acting as liquidator of the affairs of the New York National Insurance Company, brought this action to recover the amount named in a depository bond issued to that company by the defendant the United States Fidelity and Guaranty Company. The bond was executed on the 2d day of June, 1919. The defendant thereby undertook to indemnify the New York National Insurance Company for any loss of its deposits in the North Penn Bank of Philadelphia, Penn., not exceeding $50,000, which might be sustained by it during the course of one year through the insolvency of the bank. The precise condition of the bond was as follows: " The condition of this obligation is such that if the principal shall, during the term of this bond, faithfully account for and pay on legal demand all moneys deposited with it by or on behalf of the said obligee and shall not suspend payment during the term hereof, this obligation shall be null and void, otherwise to remain in full force and effect." The North Penn Bank suspended payment on July 18, 1919, or within seven weeks after the execution of the bond. The action was defended on the ground that the New York National Insurance Company, when it applied for the bond, knew, or had reason to know, that the North Penn Bank was insolvent, and fraudulently concealed information thereof from the defendant. It was also defended upon the ground that the book entries of the North Penn Bank, showing a credit balance in the account of the New York National Insurance Company at the time of the failure of the bank, were fraudulent, and that the company had in fact no moneys on deposit at the time. The case was tried before a referee, who made a decision in favor of the plaintiff. He found that the deposits of the New York National at the time of the suspension were $245,701.83, and directed judgment in favor of the plaintiff for the full amount of the bond, or $50,000, and interest from July 18, 1919.

This is one of four companion cases brought by the plaintiff and tried before the same referee, which are now on appeal. The three other cases were brought to recover the maximum sums named in the following depository bonds: (1) A bond for $50,000, dated the 13th day of November, 1918, issued by the National Surety Company to the New York National Insurance Company; (2) a bond for $100,000, dated the 16th day of December, 1918, issued by the National Surety Company to the Seneca Fire Insurance Company; (3) a bond for $100,000, dated the 26th day of May, 1919, issued by the Maryland Casualty Company to the Seneca Fire Insurance Company. The first of these bonds guaranteed the deposits in the North Penn Bank of the New York National

14

Insurance Company. The second and third bonds guaranteed the deposits of the Seneca Fire Insurance Company in the North Penn Bank. In each case the same defenses as in this case were interposed, and in each the referee directed judgment for the full amount of the bond. The James J. Boland Company, a Delaware corporation, owned all the stock of the New York National Insurance Company when the two depository bonds were issued to that company. It owned the majority of all the stock of the Seneca Fire Insurance Company when the two depository bonds were issued to it. The officers of the Boland Company were officers of the two insurance companies. It was the Boland Company, or its officers, which caused the two insurance companies to become depositors in the North Penn Bank. The transactions, correspondence and communications of the Boland Company and its officers with the North Penn Bank and its officers are the sources of all information of the insolvency of the North Penn Bank actually or constructively acquired by the New York National or the Seneca Fire Insurance Company. The history of these transactions is embodied in four voluminous records separately made for the four cases. These records are substantially the same, except that in each case involving a bond having a late date of execution transactions not material in a case based upon a bond of an earlier date are recorded. The case now under consideration involves the bond most recently given. A detailed statement of facts made herein will of necessity, therefore, include substantially all the facts which are material in prior actions.

The North Penn Bank of Philadelphia, Penn., was organized in the year 1910, with a capital stock of $150,000. Ralph T. Moyer was at all times its cashier and dominated its affiairs. From a period early in its history it was managed with an audacious disregard for the principles of sound business, the rules of common honesty and the plainest behests of the law. As early as September, 1918, its assets were found by the State Department of Banking to have been depleted to the extent of $91,438.34, and the impairment was directed to be made good. In less than two years thereafter it closed its doors. An indebtedness to depositors of $755,808.80, which had been suppressed by falsification of its controlling books, was then revealed. Among its more or less worthless assets was a charge against overdrawn checking accounts of the enormous sum of $1,386,552.04. Its cashier, Ralph T. Moyer, was subsequently convicted of a felony arising out of transactions connected with his management of the bank.

The James J. Boland Company, Inc., was organized in July, 1916, to conduct a fire insurance agency business at Scranton,

Penn. James J. Boland became its president, his wife, Nancy P. Boland, became its treasurer, and J. Russell Jones its secretary. James J. Boland had previously conducted a fire insurance agency at Scranton, Penn. Nancy P. Boland was an expert bookkeeper, and J. Russell Jones had had experience in banking. It does not appear that any one of the three were possessed of substantial assets. It does not appear that the James J. Boland Company, prior to the initiation of its ambitious venture in the ownership and management of fire insurance companies, had substantial assets or large properties other than the claimed good will of a fire insurance agency. It had never engaged in any transaction requiring the borrowing of large sums of money. The largest note which it had ever negotiated was a note for $10,000. Within a short period of less than three years this modest borrower had so enlarged its field of action that for the purchase of the stock of two insurance companies it was indebted upon its notes for more than half a million dollars, and, according to the findings of the referee in this action, was in addition thereto at one time obligated to the North Penn Bank on unsecured paper and overdrafts to the extent of $426,863.76.

The purchase of insurance companies by the financially insignificant Boland Company was an ambitious project which had, however, its alluring side. Fire insurance companies of any magnitude receive large sums annually in premiums. These are paid in advance to cover risks during a period of from one to three years. Large cash reserves are required to be maintained against unearned premiums and contingent risks. The general agents of such companies receive all premiums. If the Boland Company could purchase insurance companies, its directors might become the companies' directors, and it might itself become their general agent. It might maintain the deposits of itself and all the companies in some one complacent bank. Then the Boland Company could deposit all the premiums in its own account and have full use thereof. In order to preserve the appearance of maintaining the required cash reserves in the accounts of the insurance companies it would only be necessary for the Boland Company to draw its checks payable to the insurance companies and have them credited. If these checks did not create overdrafts in excess of the insurance deposits the bank would part with no cash and the Boland Company would have full use of the company reserves. This is not a fanciful conception, but the statement of an actual scheme which the Bolands eventually put in operation, having found their complacent banker in Ralph T. Moyer of the North Penn Bank.

All the capital stock of the New York National Insurance Company was purchased in March, 1917, by the James J. Boland Company from one Morris Tremaine for the sum of about $365,000. For the purpose of making the purchase it borrowed of the Citizens Commercial Trust Company of Buffalo about the sum of $260,000, pledging the stock of the New York National Insurance Company to secure the loan. It gave its notes to Morris Tremaine for $25,000. It does not appear how the balance of the purchase price, which was upwards of $80,000, was provided for. In the absence of any explanatory proof it would seem probable that the additional moneys were borrowed from sources not revealed. James J. Boland, the president of the Boland corporation, became the president of the New York National; Nancy P. Boland, the treasurer of the Boland Company, became its treasurer; J. Russell Jones, the Boland secretary, became the secretary of the New York National. The Boland Company was created the general agent of the New York National Insurance Company, and the offices of the New York National were transferred to the rooms of the Boland Company in Scranton, Penn. Thereafter the Boland Company did receive the premiums of the New York National as its general agent. In a single year the premiums of this company amounted to more than $300,000.

It became necessary for the James J. Boland Company in May, 1917, to make preparations to meet certain of the notes aggregating $25,000, which had been given by it to Morris Tremaine on account of the purchase of the insurance company stock. It applied to the North Penn Bank for a loan of $15,000 in the month of May, and its application was refused. It applied again in June, and the loan was arranged for, but not fully consummated. Three promissory notes for $5,000 each, given by the Boland Company, were finally discounted by the North Penn Bank, one in June, one in September and one in October. In reference to this simple loan as many as eleven letters were exchanged between J. Russell Jones, as secretary of the Boland Company, and R. T. Moyer, the cashier of the North Penn Bank. They exhibited on the one hand a great anxiety on the part of the Boland Company to obtain the loan, and upon the other a great reluctance on the part of the bank to make it. Moyer writes that he " would try to put part of these loans on," regrets that he has been " unable to discount this paper," says " I trust to be in funds next week," and states " I appreciate very much your kind indulgence in this matter." When at last two of the notes had been discounted Jones writes to Moyer: " I wish to add that your consideration of us at a time when you had to *stretch a point* is very much appreciated."

Moyer replies that *" It was quite a hardship for us,* just at this time, to put these notes on, as we are loaned up very closely." The transaction is important, for it discloses that at the very outset of their relations the officers of the Boland Company knew that the North Penn Bank was a weak institution with a loaning capacity so limited that it required four months' time and much thought and correspondence for it to get in shape finally to make a loan of so slender an amount as $15,000.  With this knowledge obtained thus early the officers of the Boland Company must have known that its apparent borrowings subsequently made of the North Penn Bank were far beyond the capacity of the bank.

The New York National Insurance Company opened an account with the North Penn Bank on November 30, 1917, with a deposit of a Boland Company overdraft check on the same bank for $7,125.07.  On December third it deposited a Boland overdraft check for $11,777.03, and on December eighth a further overdraft check for $7,000.  After these credits were given and upon December 8, 1917, the Boland Company sent to the North Penn Bank its notes for $20,000.  The purpose of these notes was in part to cover the overdrafts occasioned by the credits then given to the New York National.  It was agreed between Moyer and the Bolands that to the extent of $20,000 the account of the New York National was not to be drawn against.  Moyer writes that the arrangements were " that the proceeds of the $20,000, which we are to discount, are not to be drawn against, but are to be kept as a balance."  James J. Boland writes, " You are correct in your understanding that the twenty thousand dollars is not to be checked against.  We wish to carry this with you in the account of the New York National, and we are placing this amount with you in advance of discounting the notes."  As a matter of fact the notes were never discounted by the North Penn Bank and the balance credited to the New York National continued its character of a bookkeeping credit based upon checks given upon an account already overdrawn.  It was a convenient arrangement.  The credit to the insurance company and the charge to the Boland Company washed each other, and without a dollar lost to the North Penn Bank the insurance company came into an apparent balance of more than $20,000.  The agreement that this amount should not be drawn against made the situation easy for the bank.

At the close of this transaction the accounts of the two corporations in the North Penn Bank stood as follows: New York National credit balance $25,902.10; Boland Company overdraft $3,306.03.

In the late fall of 1917 the Insurance Department of the State

of New York notified the New York National Insurance Company that its surplus was impaired to the extent of $30,000, and that this amount must be made good. This was accomplished by depositing with the North Penn Bank to the account of the New York National Insurance Company two Boland overdraft checks, one for $20,000 and the other for $11,888.66. These checks were dated December twenty-fifth, and on December twenty-eighth the account of the New York National Insurance Company showed a deposit of $31,888.66. Neither the Boland Company nor the North Penn Bank suffered a loss of money, while the New York National, for Insurance Department purposes, received the necessary credit. No notes of the Boland Company or of any other person or corporation were ever discounted in connection with this transaction.

At the close of this transaction the accounts of the two corporations in the North Penn Bank stood as follows: New York National credit balance $57,790.76; Boland Company overdraft $30,783.48.

The Bolands, having rescued their insurance company from enforced liquidation by these fraudulent means, for about a half year thereafter appear to have pursued a more or less tranquil course, and during that period, so far as the record discloses, indulged no further in the operations of high finance for which they appear to have been so characteristically fitted.

In August, 1918, the James J. Boland Company determined to engage more deeply than before in the fire insurance business. Accordingly it entered into an agreement to purchase a majority of the capital stock of the Seneca Fire Insurance Company, a domestic corporation, approximately for the sum of $340,000. In order to raise a portion of the purchase price it borrowed $125,000 from the Metropolitan Trust Company, pledging the stock of the Seneca Company as security therefor. The Seneca Company had active deposits in several Erie county banks, including a deposit in a bank at Springville aggregating $68,604.27. The Bolands evolved a clever scheme of making use of these large deposits in effectuating a purchase of the insurance company to which it belonged. Jones informed Moyer that he wished to borrow $50,000 for the Boland Company; that he would open up an account in the name of the Seneca Fire Insurance Company in the North Penn Bank; that he would at all times keep $50,000 on deposit in the bank during the life of the loan. Moyer told him that his bank was low in its reserves and could not loan him the money. However, it was apparently agreed that if the Bolands would deposit $50,000 for the Seneca Company the bank would loan

the Boland Company an equal amount. On August 27, 1918, Jones sends Moyer five notes of the Boland Company for $10,000 each, inclosed in a latter wherein he states, " We will deposit $60,000 to remain on deposit during the time these $50,000 notes are running. This will be forwarded you from Buffalo immediately on my arrival there this week." These notes were never discounted or put through the bank in any form. However, on August 30, 1918, the Boland Company drew its overdraft check on the North Penn Bank for $67,930 payable to its account in the Citizens Commercial Trust Company of Buffalo. On the same day it deposited the sum of $125,000 received from the Metropolitan Trust Company, and withdrew the two items by a check of August 31, 1918, for $189,850, payable to Adam Cornelius, the seller of the Seneca stock. Meanwhile, the trade for the Seneca stock was consummated on August thirtieth, and on August thirty-first the Bolands deposited to the credit of the Seneca Fire Insurance Company in the North Penn Bank certified checks for $68,604.27, which withdrew the deposits of. the Seneca Fire Insurance Company in various banks in Erie county. By virtue of this rapid work on the part of the Bolands the moneys of the Seneca Company were on deposit in the North Penn Bank before the Boland overdraft check for a slightly less amount was presented for payment. As a result the moneys of the bank were not in the least depleted, and the Boland Company, for its individual purposes, in effect obtained the use of moneys belonging to the Seneca Fire Insurance Company of which it had obtained possession in a fiduciary capacity for deposit in the North Penn Bank. How the additional moneys of approximately $150,000 required for the purchase of the Seneca Company were obtained by the Boland Company is not disclosed. No testimony was given showing that the balance was paid in cash derived from moneys or property owned by the Boland Company. It may be significant, however, that from the deposits of the Seneca Fire Insurance Company in the Citizens Commercial Trust Company of Buffalo there was withdrawn between October 2 and October 11, 1918, the sum of $80,000. This money was not deposited in the North Penn Bank to the credit of the Seneca Fire Insurance Company or the New York National or the James J. Boland Company. It may have been deposited in some other bank to the credit of the Seneca Company and made available to the Boland Company for part payment of the purchase moneys of the Seneca according to the overdraft method so firmly established in the North Penn Bank.

When the Boland check upon the North Penn Bank for $67,930, drawn for the purpose above related, was· paid by the bank

the accounts of the three corporations therein stood as follows: New York National credit balance $26,493.32; Seneca Company credit balance $68,604.27; Boland Company overdraft $54,066.59.

As in the case of the New York National Insurance Company, James J. Boland now became the president, Nancy P. Boland the treasurer, and J. Russell Jones the secretary of the Seneca Fire Insurance Company.  From this on the principal offices of the Seneca Fire Insurance Company were located at Scranton, Penn., in rooms already occupied by the Bolands as officers both of the James J. Boland Company and the New York National Insurance Company.

In October, 1918, the Bolands drew a check on the Boland Company account for $7,000, and a check upon the New York National account for $10,000, which were deposited in the Citizens Trust Company of Buffalo.  The first of these checks was an overdraft, for the Boland account in the North Penn Bank was then overdrawn for more than $50,000.  The second of the checks was drawn upon an account in which there was a credit balance. Nevertheless the North Penn Bank permitted both of the checks to go to protest.  Moyer explained the matter to Jones by saying, " We were very short of funds, and we returned the checks to make a day or twos time on the payment of them."  After this experience the Bolands and Moyer entered into an agreement that the former would draw no large checks on the North Penn Bank without having given advance information to Moyer of its intention so to do.  This practice was thereafter quite generally observed: As early as October, 1918, therefore, the Bolands knew that the North Penn Bank was not an institution sufficiently sound to permit withdrawals without notice of the sum of $10,000, although the withdrawals were attempted to be made from an account showing a credit for a greater sum.

In a letter dated December 2, 1918, J. Russell Jones, for the Boland Company, writes Moyer as follows:  " We are sending you check for $10,000 and one for $1,626.02, which you can immediately turn into *real money*."  He then states that he incloses a Boland Company check for $30,000, which he wishes Moyer to place to the credit of the Seneca Fire Insurance Company, and says:  " This, of course, you will hold, as in the case of the last one I left with you."  The letter also contains a promise that there will be no withdrawals for a time against this $30,000, and states that the Boland Company will not thereafter permit withdrawals of any size without first giving notice.  Moyer explains the prior arrangement spoken of by stating that under it the Boland Company check was not to be charged, but was to be carried as

a credit memorandum until deposits came in to equal the check. In accordance with a subsequent direction this check for $30,000 was credited to the New York National rather than the Seneca.

At the close of this transaction the accounts of the three corporations in the North Penn Bank stood as follows: New York National credit balance $73,865.66; Seneca Fire Insurance Company credit balance, $13,960.53; Boland Company overdraft $92,566.19.

The Boland Company, in December, 1918, owed the New York National for August agency balances the sum of $14,425.69, and for September agency balances $28,777.65, or a total of $43,203.34. In an examination made of an insurance company by the Department of Insurance under the New York State law, agency balances more than three months overdue are not entitled to credit as assets. As an examination of the New York National would take place in the spring of the year 1919, it was necessary, in order that the New York National might obtain credit therefor, that the agency balances of August and September thus owing by the Boland Company should be paid it before December 31, 1918, or that the New York National should receive a bookkeeping credit therefor in an account kept with a banking institution. In order to meet this situation the Boland Company on December 30, 1918, drew its overdraft check upon the North Penn Bank for $43,203.34 in favor of the New York National, and this check was credited to the account of the New York National in the North Penn Bank on December thirty-first. That the sole purpose of this transaction was to give a false credit to the New York National for purposes of an impending examination by the Insurance Department is conclusively shown by the undisputed testimony of Cashier Moyer. He testified that J. Russell Jones, the secretary both of the Boland Company and the New York National, explained to him the transaction afterwards had, as related above, by saying " that they wanted to transfer some money to the New York National Insurance Company *for window-dressing purposes* over the end of the year." Again the transaction washed itself, the credit to one account in the North Penn Bank exactly balancing the debit made to another account in the same bank, and the North Penn Bank had lost no moneys. However, by this happy transaction which cost nobody anything the New York National Insurance Company, *for window-dressing* purposes, was enriched by the sum of $43,203.34.

At the close of this transaction the accounts of the three corporations in the North Penn Bank stood as follows: New York National credit balance $61,069; Seneca Fire Insurance Com-

pany credit balance $123,960.53; Boland Company overdraft $124,999.14.

In the early months of 1919 the New York Insurance Department conducted an examination into the affairs of the New York National with a result that it found its surplus impaired to the extent of $100,000. The examination was completed as of March 31, 1919, but was held open until May. On or about March 10, 1919, according to the testimony of James J. Boland, the directors of the New York National were told by officers of the Insurance Department that in order " to permit the company to continue in business " the impairment must be made good. Boland made an effort to raise the money at various banks, but only at the North Penn Bank was he " given any consideration." Moyer says that Boland came to him with two checks, one for $100,000 and one for $29,390.61, and said that he must have $100,000 on account of difficulties he was having with the Insurance Department because of their low reserves. Moyer says that he told him that it was impossible to loan him the money at the time. If Moyer had honored these checks in the usual way the total result would have been that the Boland overdraft would have become $308,990.69, whereas the New York National would have been correspondingly credited, so that no cash would have been lost. The lack of complacency exhibited by Moyer on this occasion may have been due to a fear that all was not well with the New York National, and that if the New York Insurance Department investigated further the house of cards which he had built up by false credits and false debits might fall to the ground carrying with it the North Penn Bank. At any rate Moyer did decline to cash, to debit, or to credit these checks, and the same never passed through the accounts of the bank, so that neither the New York National was credited nor the Boland Company was ever debited therewith. The checks were left by Boland with Moyer and placed under his ink well, where they remained until their discovery after the doors of the bank had closed.

The date of the checks was March 29, 1919. At this date the accounts of the three corporations in the North Penn Bank stood as follows: New York National credit balance $61,613.08; Seneca Fire Insurance Company credit balance $143,429.38; Boland Company overdraft $179,594.08.

A method of assisting the New York National successfully to deceive the inquisitive officers of the New York State Insurance Department, other than passing these bogus checks through the books of the bank, was conceived and carried out by the Bolands and Moyer. On April 2, 1919, Nancy P. Boland, the treasurer

of the New York National Company, wrote Mr. Moyer asking him for a certificate showing the deposits of the New York National as of March thirty-first, in order that the same might be forwarded to the Insurance Department. At the foot of the letter a computation appears consisting of the figures $85,309.08, underneath the figures $129,396.61, and underneath the figures of a total of $214,705.69. The first figure represented the credit balance of the New York National as it appeared on the books of the bank, and the second figure represented the aggregate amount of the two checks which Moyer refused to receive. Moyer failed to follow the lead which was thus given, and returned to Nancy P. Boland a certificate showing deposits on hand of $85,309.08. Mrs. Boland on receipt of this paper called Moyer on the telephone and stated that it put the company in a very embarrassing position not to have the $129,000 included. Moyer told her that he had not credited that amount, and could not credit it. Moyer says that " she asked me then whether I would not add it on that statement and return it to her, so I did." Accordingly this fraudulent certificate was forwarded to the New York State Insurance Department, and the New York National was temporarily saved. On several occasions thereafter Moyer forwarded statements to the New York National, showing the credit balance of that company in his bank, in all of which the amount of the two checks for $129,396.61 was not included. Repeatedly he was asked to add these checks to the statement for the purpose of satisfying the Insurance Department, and each time he complied with the request. Notwithstanding the undisputed testimony that these two checks were never accepted by the bank and the amount thereof never loaned, credited or charged, the referee in figuring the amount of deposits to the credit of the New York National at the date of the failure of the bank added to its apparent balance as the same was disclosed by the books of the bank the amount which the two checks totaled.

In an effort to procure the loan which had been refused, the Bolands sent to Moyer five promissory notes for $20,000 each, made by F. A. Surdam, T. J. McDonald, R. S. Houck, J. Russell Jones, and the " Seneca Fire Agency, Inc., A. Kennedy, Assistant Treasurer." Each note was payable to the maker and indorsed by him or it. Surdam and McDonald were clerks of the Boland Company and had no property. Houck was an attorney and had no financial means other than interests in the Boland Company stock. A. Kennedy was Anna Kennedy who was in the employ of the Bolands as a bookkeeper. She was not the assistant treasurer of any company known as the Seneca Fire Agency, Inc. All of these notes were entirely

worthless and fraudulent. However, they were never discounted by Moyer, and no moneys were loaned thereon by the North Penn Bank.

The New York National had no sooner weathered the storm raised for it by the New York State Insurance Department by obtaining from the North Penn Bank a false certificate crediting them with an additional $100,000, than troubles began to brew for it and the Bolands in another quarter. The Boland Company still owed in April, 1919, to the Citizens Commercial Trust Company of Buffalo the sum of $165,000, which had been borrowed from it on the purchase by the Bolands of the stock of the New York National. Roy H. Griffin, vice-president of the Commercial Trust Company, about the middle of April had an interview with James J. Boland. He told Boland that he had heard of a judgment taken against the Boland Company for $10,000; that there were many disquieting rumors; that he knew of two $4,000 checks which had been returned by the North Penn Bank; that he could not take renewals of the Boland loans. About this time Griffin also saw Mr. Diebold, who was vice-president of the Boland Company, and a director of the New York National, and said to him: " I told him we would not take renewals until we had a copy of the report of the State Superintendent of Insurance, and full and satisfactory information regarding the Boland Company." Boland then had an interview with Moyer in reference to raising the money from the North Penn Bank to take up the indebtedness to the Commercial Trust Company. He testified that Moyer agreed to loan $180,000 on a transfer of the stock of the New York National Insurance Company which theretofore had been pledged to the Commercial Trust Company, and to advance the Bolands $100,000 in two cashier's checks, one for $60,000 and one for $40,000.

Moyer gives a more probable version of the conversation had between him and Boland. He says that Boland asked for a loan to take up the Commercial Trust Company indebtedness, but that he told Boland that it " was out of the question to loan any such amount of money as that." Boland said that they had a time deposit of $100,000 in the name of the New York National in a Buffalo bank, and asked whether if he brought that deposit down Moyer would permit him to " draw " against that money to pay off this loan. Moyer testified: " I told them if they put in the $100,000 I would let them draw $100,000 against the James J. Boland account." He also testified: " I told them that we could not let them draw any more money than they put in, that we were in no position to loan them any money. That they would have to get the balance of the money if they wanted to draw it."

Moyer's version of the conversation is corroborated by the testimony of Griffin to whom Boland returned after seeing Moyer. Griffin testified: " He (Boland) said he had made an arrangement with the North Penn Bank to borrow money enough to take up our loan, providing we would permit him to transfer the special interest deposit of the New York National Insurance Company, amounting at that time to $105,000, to the North Penn Bank." The actual amount of this interest deposit was $107,193.95. Boland further stated to Griffin that " his loan at the North Penn Bank was contingent upon our permitting him to transfer that balance ($107,193.95) down there previous to his making that loan, and, after due consideration and consultation with my associates, I permitted them to do that. He promising to take up the balance of $165,000 owing to us within five days after such transfer was effected." On April 25, 1919, the account of $107,193.95 was transferred from the Commercial Trust Company to the North Penn Bank.

On May 2, 1919, Moyer delivered a cashier's check for $60,000 to the Bolands, and on May 5, 1919, a further cashier's check for $40,000. It is significant that the check for $60,000 was not delivered to the Commercial Trust Company until May 16, 1919, and that the check for $40,000 was not delivered until several days later. The conclusion cannot be escaped that the reason for this delay was definite information given to the Bolands by Moyer that the North Penn Bank was in a precarious financial condition, and might at any day be compelled to suspend payment and close its doors.

As illustrating the fraudulent character of the many transactions of the Bolands, had with Moyer, it may be well here to state that, in an effort to obtain the loan, the Bolands sent to Moyer twelve worthless notes for $15,000 each. Among the makers of these notes were a mythical concern styled " Central Adjustment Bureau," an office boy eighteen years old, a clerk nineteen years old, a colored chauffeur who worked for Boland, two stenographers for the Bolands, and several other employees. None of the makers were worth any property. These notes were never discounted or put through the bank in any form, but were thrown into Moyer's private drawer where they were found when the bank failed.

Moyer testified that just prior to the delivery of the $40,000 check he saw Boland and Jones in New York. He testified that at this meeting " I told Mr. Boland that we were in a very bad condition, that I was very much worried, and it was a case of getting some money and getting it quick or something very disastrous might happen." He also testified as follows: " I said

to Mr. Boland it would be a very serious matter for me if anything should happen to that bank, and he said it would not only be a serious matter with myself, but it would be a very serious matter with both of them." He further testified: " I furthermore said that the reason I was so much worried at that time was due to the fact that the Insurance Commissioner of the State of Pennsylvania had served notice on us that he intended to withdraw an account in the neighborhood of $200,000 from our bank, and that there was no possible way for us to pay off this money unless the large debtors of the bank repaid their debts to us." Boland told Jones to try to make arrangements for the money at the Metropolitan Trust Company, but on the following day telephoned Moyer that he had been unsuccessful.

On May 17, 1919, Moyer wrote Jones in relation to the $40,000 check as follows: " My dear Russell: I trust you will be able to prevail upon our friends in Buffalo not to use check which I gave you the other day as I received notice today from the Insurance Commissioner that he is going to draw $50,000 on Monday. You know this must be met or else we will get in serious trouble and for the life of me I cannot see where I am going to get money in the meantime to pay these two checks." On May 21, 1919, Jones wired Moyer: " Check not to be given Citizens Bank Buffalo until Monday. Hope this will help you some. Griffin not pleased. Said I must give it to him yesterday. I said impossible check in our attorneys hands till Monday." The $40,000 check was delivered to the Commercial Bank on May twenty-sixth, but was never charged to the Boland account at the North Penn Bank until June ninth. The check was made out to the James J. Boland Co., and was indorsed by the " James J. Boland Co., Inc." In order to gain time Moyer refused payment upon the check when it came back to him through the clearing house on the ground that the indorsement did not exactly correspond with the name of the payee on the face of the instrument. Jones told Moyer that Griffin said that this " was a trick on the part of our bank to gain a little more time in the payment of the check." Moyer testified: " I told him that was the fact."

Although what has just been told forms but a part of a story not yet finished, it may be well to interrupt it here for the purpose of noting that the bond in suit in this action was given on June 2, 1919, and that the bond issued by the Maryland Casualty Company to the Seneca Fire Insurance Company was issued on the 26th day of May, 1919, and that all the transactions, correspondence and conversations heretofore related took place prior to the earlier

of these dates. Although the few facts remaining to be related did in the main occur after the issuance of the two bonds they merely continue a story of knowledge already begun, and would seem to be available as indicating information already possessed of the insolvency of the North Penn Bank.

At the request of Jones, made in his telegram to Moyer on May 21, 1919, two cashier's checks, one dated May 29, 1919, for $30,000, and one dated June 26, 1919, for $35,000, were issued to the Boland Company. These checks, together with the check for $60,000 and the check for $40,000, would have made up the required sum of $165,000 necessary to be paid to the Commercial Trust Company. These checks were never delivered to the Commercial Trust Company, were never charged to the Boland account and were never returned to the North Penn Bank. The only explanation of their not being used is that James J. Boland and J. Russell Jones were aware that if the same were presented to the North Penn Bank that bank would not be able to pay them and would immediately close. Early in July Boland and Jones were enabled to procure a loan on the stock of the New York National from the Marine Trust Company sufficient to meet the balance due to the Commercial Bank of Buffalo. Boland and Jones thereafter made strenuous efforts to save the North Penn Bank and thereby to save the two fire insurance companies. On July tenth Jones wired Moyer from Buffalo: " Have fifty in sight in five places. Looks good barring accident. *Hang on hard* and if you can use fifteen hundred shares Seneca value forty-five thousand wire me Hotel Iroquois." On July fourteenth Jones wired Moyer: " Bank open tonight. Cashier North Penn Bank. Will have certified check Tuesday morning forty thousand and more to come." On July sixteenth he wired again that he had checks ready to deliver, and says: " I will see you Friday morning. You must be granted this time. It means another fifty." The bank did not open Friday, for Friday was the eighteenth day of July, and on that day the doors of the bank were closed.

We are convinced that in May, 1919, the managing officers of the James J. Boland Company were fully cognizant of the precarious condition of the North Penn Bank and were well aware that, unless the miraculous should happen, the bank must shortly suspend payment of its obligations and close its doors.

The Boland Company officers knew that the North Penn Bank was financially an insignificant institution; that it was capitalized for the modest sum of $150,000; that within two years it had been able to make the Boland Company a genuine loan of $15,000 only after the proposed loan had been under consideration for months;

that the finances of the bank were strained in making this loan; that the bank was run by its cashier, Moyer, in a reckless, criminal and unbankinglike manner; that Moyer had been in league with themselves to permit them to use for the individual purposes of the Boland Company immense sums of trust moneys deposited by them; that he permitted them to window dress the banking accounts of the New York National by fictitious credits of more than $70,000; that he had done this knowing that the purpose of the credits was the falsification of its accounts to deceive the examiners of the Insurance Department; that Moyer had, at their request, issued a false certificate to deceive the insurance examiners; that this certificate certified the deposits of the New York National to be greater than the amount actually credited to them on the books of the bank by the large total of more than $129,000; that Moyer had given them credit on the books of the bank for checks drawn without funds to such an extent that at one time they were debited with overdrafts of more than $400,000; that Moyer had permitted checks drawn on accounts apparently having funds to go to protest; that Moyer had issued cashier's checks for large amounts when there were no funds to pay them; that several of such checks were allowed to go to protest; that their company was financially unable to pay the overdraft checks with which they were charged; that their own apparent borrowings, if genuine, could not be paid if called; that their non-payment, if the insurance moneys were withdrawn, would wreck the bank; that the irregular practices of Moyer, doubtless, extended to transactions with other customers than themselves; that no bank could be sound which was honeycombed with transactions of so irregular and criminal a nature. In addition to all this, when we come to the month of May, 1919, we find definite information given to the managing officers of the Boland Company, who were the managing officers of the two insurance companies, that the bank was in a precarious condition and might be compelled at any moment to close its doors. During this month Moyer told Boland, the president, or Jones, the secretary, of the three companies, that " something very disastrous might happen " to the bank; that it would be serious " if anything should happen " to the bank; that " there was no possible way for us to pay off " moneys which were about to be withdrawn; that he could not " for the life " of him see where he was " going to get money in the meantime to pay " cashier's checks which he had issued. These facts, and many others which a limited space forbids recounting, lead inevitably to the conclusion that when the bond in suit and the bond of the Maryland Casualty Company of May 26, 1919, were issued the North Penn Bank was, to the knowl-

edge of the Bolands, in a condition of insolvency, and none but the most incredulous person could arrive at a contrary conclusion.

James J. Boland, the president of the James J. Boland Company, which, as the general agent of the New York National and the Seneca Fire Insurance companies, had in charge the procurement of depository bonds for these companies, himself directed the procurement of the bond now in suit and the bond of the Maryland Casualty Company issued on May twenty-sixth. James J. Boland, as before related, was also the president of the New York National and the Seneca Fire Insurance companies. The New York National and the Seneca Fire Insurance companies paid no premiums, made no contracts, and procured no bonds unless James J. Boland, their president and the president of their general agent, was, when the bonds were obtained, in effect the very corporations which he represented. There is not here presented, therefore, the question as to when the knowledge of an agent is attributable to the principal in reference to transactions performed on behalf of the principal by an agent other than the one having knowledge. These corporations acted to obtain bonds only if the acts of James J. Boland were corporate acts. If James J. Boland was the corporation which obtained the bonds, then the knowledge possessed by him when he obtained them was corporate knowledge. The authorities are clear upon this point. (*Holden* v. *N. Y. & Erie Bank*, 72 N. Y. 286; *Taylor* v. *Commercial Bank*, 174 id. 181; *Rockey River Development Co.* v. *German American B. Co.*, 193 App. Div. 197.) The cases cited by the respondent serve only to accentuate the point. (*President, etc.*, v. *Cornen*, 37 N. Y. 320; *Mayor, etc.*, v. *Tenth National Bank*, 111 id. 446; *Casco Nat. Bank* v. *Clark*, 139 id. 307; *Brooklyn D. Co.* v. *Standard D. & D. Co.*, 193 id. 551.) In the *Cornen* case the payee of a note was a director of the bank which discounted it. It was held that his knowledge of a defense to the note was not the knowledge of the bank for he was not acting for the bank in causing it to be discounted. The court remarked: " It is to be remembered that Jessup, although a director of the plaintiffs' bank, was not acting as such in the discounting of the note." In the *Tenth National Bank* case moneys had been advanced by a bank on bills for public work which had been fraudulently raised by municipal commissioners having the work in charge. Several of the commissioners were directors of the bank, but it was held that their knowledge was not imputable to the bank. The court remarked: " But none of these directors represented the bank in these transactions and in no way acted for the bank in them." In the *Clark* case the payee of a note was a corporation, one of whose directors

15

was also a director of the bank which discounted it and knew of a defense to the note. He offered the note to the bank for discount, and it was held that his knowledge was not that of the bank. · The court said: " He in no sense represented, or acted for the bank in the transaction. * * * The knowledge with which the bank as his principal would be deemed chargeable, so as to affect it, would be where, as one of the board of directors and participating in the discount of the paper, he had acted affirmatively, or fraudulently, with respect to it." In our case the James J. Boland Company and its directors were not acting for themselves in procuring these bonds, but for their insurance companies, which, under all the authorities, are, therefore, chargeable with the knowledge possessed by them.

The bond in suit was obtained through the payment of a premium of $250. It was a promise to pay if the North Penn Bank did not pay. The New York National, the obligee of the bond, had reason to know that the North Penn Bank was insolvent and would never pay, but concealed this fact from the defendant. If it may now profit by its silence it will have enriched itself to the extent of $49,750 at the expense of the defendant, as unjustly and with as little conscience or cost to itself as if it had purloined the moneys from the defendant's safe. It may not succeed, for silence under such circumstances is as abhorrent to the law as it is to the moral sense. (*Howe Machine Co.* v. *Farrington,* 82 N. Y. 121; *Vaughan* v. *U. S. Title Guaranty & Indemnity Co.,* 137 App. Div. 623.) In the case first cited the court said: " There may be circumstances known to a party taking a guaranty for the conduct of another, of so decisive a character that it could not be supposed that if known to the surety he would have entered into the obligation, and in such a case the party taking the security cannot withhold the information and enforce the obligation." In the second case the plaintiff accepted a deed of real estate, having reason to know that the owner did not execute the deed, and then procured from the defendant a policy insuring the title. It was held that on failure of title the plaintiff could have no recovery on the policy. The court, writing through Mr. Justice MILLER, said: " The defendant, upon issuing the title insurance, naturally assumed that the plaintiff's deed was genuine, and the concealment of facts within the plaintiff's knowledge, tending to show that it was not, was as fraudulent as affirmative misstatements." The respondent cites for a contrary doctrine the cases of *Black River Bank* v. *Page* (44 N. Y. 453); *Western N. Y. Life Ins. Co.* v. *Clinton* (66 id. 326); *People* v. *Lee* (104 id. 441). None of these cases sustain his argument. In the *Black River Bank* case the holding is that the sureties for a debt of another cannot, by their request, cast upon the creditor the

obligation of immediate enforcement of the securities pledged for the debt. In the *Clinton* case the holding is merely to the effect that the obligee of a surety bond is not obliged to search out the surety and explain the meaning of the words of the bond. The holding in the *Lee* case is that a bond cannot be avoided because the principal therein (not the obligee) fails to disclose to the sureties the extent of their liability.

We are fully satisfied that, for the reason that the New York National in procuring the bond in suit fraudulently concealed from the defendant knowledge possessed by it of the insolvent condition of the North Penn Bank, there may be no recovery by the plaintiff herein.

The judgment should be reversed and the complaint dismissed, with costs.

All concur, except KILEY, J., dissenting, with a memorandum; HINMAN, J., not sitting.

KILEY, J. (dissenting):

On the 13th day of November, 1918, the National Surety Company issued its undertaking, bond or policy of insurance to the New York National Insurance Company in the penal sum of $50,000. On the 16th day of December, 1918, the same company issued its undertaking, bond or policy to the Seneca Fire Insurance Company in the penal sum of $100,000. On the 26th day of May, 1919, the Maryland Casualty Company issued its undertaking, bond or policy to the Seneca Fire Insurance Company in the penal sum of $100,000. On the 2d day of June, 1919, the United Fidelity Guaranty Company issued its undertaking, bond or policy to the New York National Insurance Company in the penal sum of $50,000. The insurance companies so secured as in and by these several instruments intended and provided were fire insurance companies. The occasion for these several contracts was the application by these two fire insurance companies to these indemnity companies, for the better security of their several deposits in the North Penn Bank of Philadelphia, Penn., in language and words as follows: " does agree that if, during a term commencing at nine o'clock on the [day named in the instrument] and ending at the close of banking hours on the [day named in the instrument] the said bank for a cause amounting to insolvency or to temporary or permanent suspension of general payments, shall fail to pay to the depositor upon proper order any sum or sums which shall be at the time legally due the depositor, the company will, within ten days after receipt of proof, satisfactory to it of a default hereunder, pay to the depositor any such amount " not exceeding the penalty of the

bond. This means that the sureties will pay the amount due the depositor if the bank, by reason of inability or insolvency, fails to pay, on demand for the same. In the first instance the only valid excuse the surety company would have is that insurance companies did not have any money on deposit in such bank. The North Penn Bank suspended payment on the 18th day of July, 1919. The Seneca and the New York National Insurance companies had large deposits in the bank at that time, the loss or unavailability of which so crippled the said fire insurance companies that they were taken over by the Superintendent of Insurance of this State. The surety companies were called upon to pay the loss to the extent of their liability provided for in their contract of guaranty. They welched; the result was four actions in the Supreme Court of this State upon their several contracts of guaranty. The four actions are all based upon the same questions, all are by the same plaintiff and against the two surety companies above referred to; what I am about to say is equally applicable to each and all of the appeals. The answers set up as a defense that the insurance companies did not have any money on deposit in said bank; and second that the contracts of insurance were induced by fraudulent acts of the said insurance companies, evidenced by either their acts of omission or commission. The trial court was asked to indulge such inference and to reach such conclusion from indirect evidence produced upon the trial, which said court refused to do, and from his conclusions to the contrary and the judgments entered upon such findings these appeals are taken; in other words, we are asked to acquiesce in the suggestion, earnestly urged upon us, that the guaranties did not guarantee and that the procurance thereof was a mere idle ceremony. The circumstances urged to that end are as follows: first let me observe that the proposition that these fire insurance companies did not have any money on deposit in the North Penn Bank is dependent on the solution of the second proposition above set forth as a defense. On the state of facts found in this record, and which made it a question of fact, the trial court found that said fire insurance companies did have money on deposit, and with that finding I am in accord. The circumstances above referred to and which now call for consideration have to do with the second proposition, viz., fraud. The James J. Boland Company, Inc., was a Delaware corporation doing an insurance brokerage business at Scranton, Penn. At all times material to the consideration of the question here involved it had an income of $150,000 a year. James J. Boland was its president and his wife was its treasurer; one Jones was its secretary. As Mr. Justice KELLOGG says, they, the officers, were ambitious to extend and

enlarge its business and of necessity its field of operation; at that time they could not have had any other object; they purchased all of the capital stock of the New York National Insurance Company aforesaid for about $375,000, and a majority of the capital stock of the Seneca Insurance Company for about $340,000.   These two fire insurance companies were New York State corporations. The Boland Company did not have sufficient ready cash to pay this large consideration and were compelled to borrow a large part of it. To carry through such a financial proposition by the Boland Company, with such resources as it had, was a gigantic undertaking in itself besides, in case of failure, involved to a certainty the destruction of a good business which that company had developed and had ready at hand.   Nevertheless it was undertaken and completed so that the Boland Company got possession and control of the two fire insurance companies, with a gross income of about $300,000 each annually.   I cannot conceive of any criticism that can be made of the Boland Company for attempting this venture, except that of an error of judgment or the gratification of an excessive ambition.   This proposition could not be floated without aid of resources outside of the Boland Company.   It was done with the aid of banks from Buffalo to New York city and in the State of Pennsylvania.   If this had ultimately succeeded it would have been hailed, and rightly so, as an unusual success.   Nothing succeeds like success and nothing defeats like defeat.   The North Penn Bank was one of the moneyed institutions which was prevailed upon to aid the Boland Company in this enterprise.   James J. Boland was the prime mover and recognized head of the movement to finance and carry on the undertaking.   He was president of the three companies aforesaid in which he was interested, still a young man of indomitable energy and perseverance; he floated those loans and did it within the law of commerce and finance; no criminal charge is laid against him and he still is free.   The Boland Company was the general agent of the Seneca and New York National companies and all premiums were paid to it, and from which sums it deducted its commissions and the balance should have been deposited, by arrangement, in the North Penn Bank.   Some of them were so actually deposited; the balance was deposited by means of checks from the Boland Company drawn upon its account in the North Penn Bank, and for which the Boland Company gave its notes or notes bearing its indorsements.   I am not unmindful of the fact that some of those notes were not entered upon the books of the bank, but many of them were, and as to those there is no question that the relation of debtor and creditor existed between the Boland Company and the bank.   (*Consolidated Nat. Bank* v.

*First Nat. Bank,* 129 App. Div. 538; affd., 199 N. Y. 516; *Oddie v. National City Bank of New York,* 45 id. 735.) I hold that the same rule holds true as to notes delivered and received by the bank though not entered on the books. Moyer was cashier of the bank and from the evidence, aside from any presumption, he had authority to make loans and take the notes. (*Bell v. Hanover National Bank,* 57 Fed. Rep. 821.) The board of directors could so authorize him, but could not avoid their own responsibility. (*Wheeler v. Aiken County Loan & Savings Bank,* 75 Fed. Rep. 781.) The trial court found that these notes so delivered were *bona fide* transactions; it was a question of fact and is sustained by the evidence. It should be borne in mind that neither the Boland Company nor James J. Boland had any relation with the North Penn Bank, except that of debtor and creditor. They were not officers or employees of the bank. Moyer, the cashier and active and sole manager of the bank and its affairs, went to Scranton and made examination of the Boland Company's affairs; he found them with a business yielding $150,000 a year income, and so far as the Boland Company's affairs with the bank, he was satisfied. If the Boland Company had been the only ones with big loans he would have had no occasion for apprehension. It is urged that misrepresentation was fraudulently made by these fire insurance companies to induce the defendants to enter into this contract of guaranty. If affirmative and active misrepresentation is meant, there is not one word of any affirmative misrepresentation in the evidence in this record, made by the fire insurance companies or the Boland Company. I doubt whether that is what is meant, but what we are asked to find is that the alleged acts of omission on the part of the Boland Company in not disclosing the condition of the North Penn Bank and the fire insurance companies therewith, was such fraud as to avoid these contracts. The fire insurance companies had no business with said bank except as a depositor of its funds, and as before observed, the Boland Company had only the arrangement of debtor and creditor; it had been agreed with the bank that it might give notes and check against the fund so created for deposit in the accounts of the fire insurance companies in the bank. This was a straight business transaction, no fraud there, and there was no overdraft of the Boland Company. That I am right with reference to the status of the Boland Company notes, and that the bank at the time understood their relation as I have outlined it here, is apparent from the evidence. Marie T. Seirup, one of the bookkeepers at the bank, testified: " I took it [referring to a check] with the understanding that I was never to send any checks back on any of the large corporations such as the

Boland Company and the Fletcher Company, because it was understood that they had notes to cover their overdrafts and I was never to return any checks on those accounts." This tells in a few words the policy and arrangement between the bank and the Boland Company. In view of the large income asssured from the Boland Company, the Seneca Company and the New York National Company, when they got under way, this was not an impossible arrangement, and without resorting to any violent assumption, it is again asserted that if the Boland Company had been the only large creditor, the bank would have successfully weathered that gale. It is urged that the vice existing here consists in the silence of the Boland Company as agent of the insured, in that it did not disclose such facts as it possessed of the condition of the bank. The trial court found, and I concur, that the Boland Company did not know more than I have outlined above. There is no evidence that the Boland Company or any of its officers were speculating outside of its own legitimate operations, no kiting of checks; that they were stealing or converting money to any purpose other than to pay up the large indebtedness incurred in the purchase of the two insurance companies — in the absence of such evidence the presumption is that the money was used legitimately. The evidence bears out the contention that the Boland Company knew nothing of the condition of the North Penn Bank aside from its own relation therewith. It will be recalled that the Boland Company moved from Scranton, Penn., to New York city. Boland swears this was about June 10, 1919. Moyer was called as a witness by the defense and testified to a conversation he had with James J. Boland and Jones after they had moved to New York and in the Boland Company office there — both Boland and Jones were present. The part of the conversation detailed by Moyer and very pertinent here is as follows: " I said to Mr. Boland it would be a very serious matter for me if anything should happen to that bank, and he said it would not only be a serious matter with myself, but it would be a very serious matter with both of them. *Then Mr. Jones asked me if there were any other accounts in the bank that were giving me any concern or worry outside of the James J. Boland Company account, and I stated that we had one other account, a large account, upon which we had advanced considerable money on a war contract, and that was also giving me quite a little bit of worry, but we expected that to be liquidated in a very short time."* Moyer was defendant's witness and was anything but friendly to the Boland Company, as will appear from reading his evidence. In the face of this evidence and other evidence of equal potency, we cannot find that the Boland Company had knowledge of any straight-

ened condition in this bank before these insurance contracts were made. Eleven days before the bank closed its doors James J. Boland, for the Boland Company, deposited $35,000 in cash in this bank. Did he know at that time it was tottering to its fall? The appellants urge that he made that deposit in an effort to prevent the crash and the consequent destruction of his fire insurance companies. If the Boland Company had the knowledge imputed to it by the defendant, sufficient to charge it with fraud because it did not impart that knowledge to the defendants, then James J. Boland knew that putting $35,000 in cash into that bank was as fatal to that money's continued existence as to have thrown it into a burning building. To hold that with such knowledge he made that deposit is to endow him with a degree of idiocy that eliminates him from any consideration as a factor in a conspiracy that must rest on a gold basis standard. Experience, observation, acquired knowledge and common sense make obvious the fact that two primal factors, one and sometimes both, are present to work the destruction of any bank, viz., dishonesty and corruption of its officers and employees, and incompetency and indifference in its board of directors. This record is devoid of any evidence showing knowledge on the part of the Boland Company of either of those factors. Of course I am not unmindful of the contention of the defendants that it was a conspiracy between J. J. Boland and Moyer, the managing officer of the bank, and that it was necessary to that end that J. J. Boland have all such knowledge; but what was the conspiracy? To bring about just what has happened, destroy the bank and destroy the three companies that went down with the bank in this crash. The Boland Company did not have that knowledge, they did not want any such result; it had knowledge, through its officers, of its relation with the bank; that relation, as before observed, was that of debtor and creditor, and it was not necessarily fatal, and if it was not for outside or other inside weakness of which the Boland Company had no knowledge, it was not even probably fatal. Under such circumstances, J. J. Boland, as president of the Seneca and the New York National Fire Insurance companies, was not called upon to give any notice to the defendants. (*Western N. Y. Life Ins. Co.* v. *Clinton,* 66 N. Y. 326; *American Surety Co.* v. *Pauly, No. 1,* 170 U. S. 133; *Howe Machine Co.* v. *Farrington,* 82 N. Y. 121; *Casco Nat. Bank* v. *Clark,* 139 id. 307; *Utica S. M. Co.* v. *Casualty Co.,* 210 id. 399; *Atlantic State Bank* v. *Savery,* 82 id. 291.) The last citation holds that a bank is not chargeable with, or affected by, the knowledge acquired by a director in his individual capacity and not as an officer of the bank or while engaged in its business; nor

is there any presumption that he communicated his knowledge to the bank. (*Henry* v. *Allen,* 151 N. Y. 1.) The findings of the trial court were supported by evidence of facts given upon the trial. A fair question of fact was presented upon every issue litigated. The Appellate Division is not authorized to disturb the findings unless they are unsupported by testimony or made against the weight of evidence. (*Benedict* v. *Arnoux,* 154 N. Y. 715, 724.) Stress is laid on the fact that a demand for $180,000 (Christmas fund) could not be met at once, or that $200,000 could not be paid immediately if the Superintendent of Insurance of the State of Pennsylvania should call upon it for that amount to be made. The North Penn Bank is a State bank, and while I am not advised of the amount of reserve it was required to keep in specie in the bank, it is inconceivable that a bank with $150,000 capital should be called upon to keep any such an amount on hand. These facts are known or should have been known by the defendants. What is the province of these surety companies? Is it not to insure against contingencies which entail losses? Or is it to take money from the business public for such insurance where there is no possibility of a loss? These defendants know that there is nothing so uncertain as a sure thing. It is their province to insure against just such contingencies as, in fact, exist here. In *American Bonding Co. of Baltimore* v. *Spokane Building & Loan Society* (130 Fed. Rep. 737) the surety company insured an officer of the association who was faithless to his trust. An expression on the province and purpose of sureties is found in the opinion, which is peculiarly applicable here. " They undertake that he shall be honest though all around him are rogues. Were the rule different, by a conspiracy between the officers of a bank or other moneyed institutions, all these sureties might then be discharged. It is impossible that a doctrine leading to such consequences can be sound." Speaking of the facts under consideration in that case the court further said: " If bonding corporations are to be sustained by the business interests of this country as being useful and worthy of support, they should be required to meet their obligations in all such cases as we have presented in this record." When the facts presented by the evidence are susceptible of two meanings, fraud or honesty, honesty must be found. (*American Surety Co.* v. *Pauly, No. 1,* 170 U. S. 133; *Lopez* v. *Campbell,* 163 N. Y. 340; *Aspell* v. *Campbell,* 64 App. Div. 393.) It was found by the trial court that the Boland Company had no overdraft in the North Penn Bank when it failed. This finding is supported by evidence of record. If there was an overdraft it was not fraudulent nor criminal under the laws of Pennsylvania that we are advised. In *Payne* v. *Freer* (91 N. Y. 48)

the court says: " As between a banking firm and a depositor not a member of the firm, an overdraft is a loan." There were overdrafts and peculations in that bank, outside of the Boland Company's indebtedness, of about $1,000,000, but the evidence fairly bears out the contention of plaintiff that Boland did not know of these. It will be recalled that in addition to issuing these policies, these defendants, one or both of them, insured officers or employees of the bank; they had rights and opportunities for investigation which were not open to Boland. They urge that their stockholders should not suffer diminution of dividends by having to meet these judgments; should others suffer on that account? Are they to be exempted from all obligation to investigate and thus defeat the very purpose for which their creation was permitted? There is one other question, not material from my standpoint, but which, as a matter of the administration of the law, should receive attention; that is the question of the competency of some of defendant's evidence. That much of the evidence was incompetent does not admit of a doubt. (*Cushman* v. *Amend*, 176 App. Div. 224.) When the claim is that the verdict is against the weight of evidence, such evidence should not be permitted to tip the scales so as to reverse the judgment of the trial court. Finally in the case of *Donaldson* v. *Hartford Accident & Indemnity Co.* (269 Penn. St. 456) practically the same facts were present as are found here. The failure of the same bank was involved. The decision in that case was against the contention of defendants in this case. I favor affirmance of all of these judgments, with costs. The appeal from the order denying an extra allowance should be dismissed, with costs.

Judgment reversed on law and facts and complaint dismissed, with costs to the defendant, appellant. The court disapproves of findings 7, 16, 17, 18, 21, 22, 23, 24, 25, 28, 29, 30, 31, 32, 33, 39, 41, 42 and 43. It finds the defendant's requests to find numbered as follows: 22–33, inclusive, 40, 50–54, inclusive, 56, 58–63, inclusive, 67, 68, 70, 71, 73–77, inclusive, 82, 84, 86–90, inclusive, 92, 95, 95a, 98, 102, 103. It finds the facts stated in requests 55, 66, 68, 69, 79, 83, 85, 91, 93, 94, 96, 99, 100, 101, except the statements therein made as to the knowledge of the New York National Insurance Company, and it finds in lieu thereof that said company had such knowledge when it procured the bond in suit. It also finds plaintiff's conclusions of law Nos. 2, 3, 4 and 5. It finds that irrespective of the evidence as to the Boland Company overdrafts and irrespective of defendant's exhibit No. 13, the New York National Insurance Company at the time it procured the bond in suit had knowledge of the insolvency of the North Penn Bank. Order and findings to be settled before H. T. KELLOGG, J.